335 A.2d 328.

ARTHUR QUINT *et ux. vs.* PAWTUXET VALLEY BUS LINES *et al.*

APRIL 10, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. Audrey McKanna should remember her first day on the job as a full-fledged duly licensed school bus driver. It was September 25, 1967.[1] The reason for the ease with which she could recall her employment anniversary date is the fact that the bus she was driving on that day was involved in a collision with a 1965 Dodge sedan which was owned and operated by Virginia Quint. This litigation followed. Virginia sought damages for personal injuries including a broken kneecap. Her husband's claim involved consequential damages. They sued Audrey and her employer, Pawtuxet Valley Bus Lines. A Superior Court jury returned verdicts for the bus driver and for the employer. The trial justice denied the Quints' motion for a new trial. They have appealed. Since the husband's claim and the bus company defense are contin-

---

[1] Audrey informed the jury that she had participated in a 3-week training program before she made her first solo drive.

gent on the conduct of the respective drivers, we shall refer hereinafter only to the drivers, and by their first names only.

The collision took place in West Warwick at the intersection of School and Church Streets in the midafternoon on a clear fall day. Audrey was driving an empty bus easterly on School Street. Virginia was proceeding southerly along Church Street. The intersection forms a "T" which appears thus:

N      Church Street      S

School Street

W

Audrey was on her way to pick up some students at a nearby elementary school and transport them to their homes. The bus she was driving had a passenger capacity of 66 pupils. It was approximately 3:30 p.m. Virginia was on her way home to Jamestown after a day spent teaching in the Coventry school system. Audrey, who had that very day received her chauffeur's license from the Registry of Motor Vehicles, had driven up the steep incline of School Street. She was to make a righthand turn and drive south on Church Street to her destination. There is a stop sign controlling the easterly flow of School Street traffic. As Audrey came up to the intersection, she pulled over to the left side of the street. A driver's view of the southbound traffic on Church Street is impeded by

the presence of a high hedge that grows alongside the edge of the lot located on the northwesterly corner of the intersection. Audrey informed the court that the pull over to the left was required by the presence of a utility pole located on Church Street[2] near the edge of the intersection's southwesterly corner and another pole situated directly across the street from the corner pole. If a vehicle as large as a bus attempted to make a southerly turn from the right half of School Street, its right rear portion would strike the corner pole or its left front would hit the opposite pole.

A sketch of the collision prepared by a West Warwick police sergeant shows that School Street is 27 feet 6 inches in width while Church Street's width measurement is 26 feet. The sketch also indicates that the bus was making its turn and the front portion was into Church Street at the time the vehicles collided.

At the trial, each driver was insistent that the other had struck her. Pictures taken at the scene indicate that the right front and side of the Dodge were damaged. They also show the point of contact on the bus as being the area just to the rear of the bus's left front wheel. Audrey told the jury that once onto Church Street, she saw Virginia some 200 feet to the north proceeding along the highway at approximately 30 miles per hour, all the while looking to her left at some individuals who were walking through a cemetery that borders the easterly side of Church Street. Audrey maintained that at the time of the collision, she was at a complete halt and that prior to that time she had blown the horn and waved her hand in an unsuccessful effort to gain Virginia's attention. Virginia, on the other hand, testified that she was looking

---

[2]There are no sidewalks on Church Street. The pole was placed within the macadamized area.

straight ahead but saw only a "blur" as the bus came out from School Street "in a second." She gave her speed as about 20 miles per hour.

Virginia was taken from the collision scene to Kent County Memorial Hospital. Its records contained the following notation made by the admitting physician: "auto accident today—auto struck bus,—did not lose consciousness." Virginia, in cross-examination, denied that this entry was an accurate accounting of what she told the doctor.

Audrey described to the jury her technique as she labored up School Street's steep incline in "low gear." Having reached the top, she came to a full stop and then proceeded to "creep out" onto the intersecting highway, giving gas to the engine with a manual throttle and alternately applying the clutch and brake pedals. The diagonal turn not only helped her to clear the corner pole but such a tack, she said, permitted her to make greater use of her rear view mirror affording her a better view of the oncoming southbound Church Street traffic.

The investigating officer indicated that Audrey told him that "I came up the hill in second gear. It isn't a real low, low gear and jumps." Audrey explained the apparent inconsistency by saying that the bus had five speeds forward with the first speed being "very low" and the second speed being "low."

When the jury returned after its deliberations, the clerk asked the foreman if he and his cohorts had found for plaintiffs or defendants. The foreman reported, "We find contributory negligence for both parties." Subsequently, the jury was polled and each member reported that he or she had found for defendants.

In their appeal, plaintiffs question several of the trial justice's evidentiary rulings, portions of his charge to the jury, and the denial of their motion for a new trial.

We shall first dispose of the new trial portion of this appeal. The trial justice in affirming the jury's finding of contributory negligence specifically rejected Virginia's contention that the bus struck her car. While he did not believe that Audrey had come to a complete halt just before the collision, he did believe that at the time of the crash, she was "creeping" out onto Church Street. On the other hand, he was convinced that Virginia was not watching where she was going and in reaching this conclusion he relied on the notation made by the admitting physician, the damage to the right side portion of the Quint vehicle, the damage to the rear of the bus's left-front wheel, and the absence of skid marks which, of course, indicated Virginia's complete lack of effort to bring the Dodge to a halt.

The trial justice has made his independent appraisal of the evidence, and the contributory negligence inference he has drawn finds support in the record. We will not disturb his conclusion.

Certain of the evidentiary rulings to which Virginia has taken objection concern the trial justice's refusal to permit the entire accident report made by the West Warwick Police to be admitted into evidence. The sketch prepared by the police was separated from the report and it became a full exhibit. The second sheet of the three-page report contained statements made by both operators and a section entitled "Officers Investigation." This investigation section contains statements as to what the police found and did at the collision scene. It makes reference to an absence of skid marks at the intersection and then states that this fact indicates "* * * that the accident happened very quickly and neither operator had time to apply the brakes."

Audrey's statement which was taken at the scene was read in full during plaintiff counsel's direct examination

of Sergeant Wilcox. Virginia's statement which did not go to the jury was taken by another officer who interviewed the driver while she was in the hospital's accident room. The statement reads, "I was headed South on Church St. This bus came up this street and shot into the street I was on. I didn't even see the bus until she shot straight in front."

In barring the use of the entire exhibit the trial justice emphasized the conclusory nature of the statement of the officer who made the on-the-scene investigation and the objectionable hearsay aspect of Virginia's out-of-court statement to the West Warwick Police relative to Audrey's negligence.

The trial justice did not err when he refused to make the police report a full exhibit. Our business record legislation is G. L. 1956 (1969 Reenactment) §9-19-13. If the trial justice is satisfied that the writing of a record was made in the regular course of business and that it was the regular business practice to make the entry at the time of the event, occurrence, or transaction, or within a reasonable time thereafter, he may admit the writing into evidence under the exception to the hearsay rule. The statute specifically states that an entrant's or maker's lack of personal knowledge as to events listed in such a document "may be shown to affect [the report's] weight." See Webbier v. Thoroughbred Racing Protective Bureau, Inc., 105 R. I. 605, 254 A.2d 285 (1969). A police report can come within the ambit of the statute. Cf. Amaral v. Turner, 109 R. I. 341, 284 A.2d 883 (1971).

Our statute was first enacted in 1928. Public Laws 1928, ch. 1161, §1. Its language today is the same as when the original statute became law. It is fashioned after and is in all major aspects identical to the Model or so-called Commonwealth Fund Act that was the product of a com-

mission headed by Professor Edmund Morgan.[3] The Model Act was just a bit more explicit in one respect than our statute. It stated that the secondhand nature of the information may be relevant as to the weight to be given its contents but it shall not affect its admissibility. However, even with such a caveat, most courts have held that the fact that a report is generally admissible under a statute comparable to the Model Act does not give a carte blanche admissibility to everything set forth in the report. *E.g., Gencarella* v. *Fyfe,* 171 F.2d 419 (1st Cir. 1948).

While the West Warwick Police Department's personnel are in the business of recording statements, Virginia was not. Her statement does not come within the reach of §9-19-13 even though the report does. As Professor McCormick said, "The problem is, of course, essentially one of 'double hearsay'. While the business records exception may serve to justify admitting the out-of-court declarations of the maker of the record * * * it does not follow that this justifies admitting the declaration of someone else simply because the maker of the record testifies to it. * * * the entry is admissible to prove the truth of what the informant told the maker only if the informant's action in reporting this was within the regular course of business, i.e., if the informant was a part of the business organization with a duty to make such reports." McCormick, *Evidence* §310 at 725-26 (2d ed. 1972). Wigmore takes a contrary view. 5 Wigmore, *Evidence* §1530 *a* n.1 at 391-92 (3d ed. 1940).

The early common law also recognized a business record exception to the rule barring the use of hearsay testimony. Its requirements were similar to those now set out in

---

[3]The commission's report may be found in Morgan et al., *The Law of Evidence, Some Proposals for its Reform* (1927).

§9-19-13, with one additional requirement. The record maker and each human link in the chain of information, if living and competent, had to testify that the entry was made in the regular course of business in his handwriting or under his immediate supervision and each provider of information contained in the report had to testify. If any necessary witness such as the maker was deemed incompetent or was absent from the jurisdiction at trial time, other witnesses had to identify the record and explain how and by whom it was kept. *State* v. *Mace*, 6 R. I. 85 (1859). The failure to account for the absence of a witness or to produce him would make the record inadmissible. Because of this burdensome requirement, statutes such as ours were enacted dispensing with the necessity for producing all the witnesses formerly necessary.

The majority of courts who have considered the admissibility of the contents of a report, such as a police report, pursuant to a statute similar to ours require that the record be based upon the maker's own observation or upon information transmitted to him by an observer *who has the business duty of transmitting such information*, and that this record be of such a nature that the person making the report if called as a witness could properly testify as to the material it contains. *Lindberg* v. *Short Line Inc.*, 399 F.2d 482 (1st Cir. 1968); *D'Amato* v. *Johnston*, 140 Conn. 54, 97 A.2d 893 (1953); *Kelly* v. *O'Neil*, Mass. App. Ct., 296 N.E.2d 223 (1973); *Holloway* v. *Eich*, 255 Md. 591, 258 A.2d 585 (1969); *Johnson* v. *Lutz*, 253 N. Y. 124, 170 N.E. 517 (1930); *see* 69 A.L.R. 2d 1148 §2 (1960). We have followed this view and have approved the actions of the trial justice who refused to allow a so-called business entry into evidence in toto because it contained objectionable hearsay or conclusions, or unsupported opinions. *DiMaio* v. *Del Sesto*, 102 R. I.

116, 228 A.2d 861 (1967); *Major* v. *Greig,* 102 R. I. 379, 230 A.2d 846 (1967).

Given these principles, it is clear that if the officer who interviewed Virginia in the accident room came to court and attempted to tell the jury what Virginia told him, Audrey's counsel's objection to the use of such hearsay would be sustained. So, too, if the investigating officer attempted to give his opinion that the lack of skid marks indicated a collision that occurred so fast that neither operator had an opportunity to apply her brakes, the objection to the question designed to produce such remarks would have been upheld. We cannot fault the trial justice's culling of the police report. Section 9-19-13 was never intended to make an entire record admissible where oral testimony as to its disputed portions would be inadmissible.

The other challenged evidentiary rulings and refusals to charge all involved matters that were aimed at supporting Virginia's claim that Audrey and/or her employer were negligent. They involved Audrey's inexperience as a bus driver, her left-of-center approach as she came to a stop at the intersection, the alleged suppression by her employer of records indicating the damage sustained by the bus, and her awareness of the high hedge blind corner. All of these issues, when all is said and done, are directed to the question of defendants' negligence. The foreman's response demonstrated the jury's belief that the negligence had been established.

One of the requests to charge deserves some mention. The trial justice did charge that a violation of a statute was one circumstance that a jury could consider in determining the negligence of the bus driver, and then he read the rule requiring the driver of a vehicle approaching an intersection to yield the right-of-way to another vehicle that has entered the intersection from a different high-

way. General Laws 1956 (1968 Reenactment) §31-17-1. However, he would not charge the jury on another rule of the road which is part of the motor vehicle code and cited as §31-15-7(a)(2). In essence, this provision states that except in one specific instance[4] no vehicle shall at any time be driven on the left side of the roadway when the vehicle is within 100 feet of or crossing an intersection or railroad track. The trial justice's refusal which he made known to counsel prior to arguments was based on his belief that the prohibitions set forth in §31-15-7 were applicable only in those instances where one vehicle was passing another. Virginia has argued with great vigor that the trial justice has misconceived the true purpose of the statute, and she claims that its prohibition was applicable to Audrey's approach to the intersection and not just to times when one vehicle is overtaking another. We shall assume, arguendo, that the trial justice's concept of the purpose of this particular provision was erroneous. Virginia maintains that his error deprived her counsel of an opportunity to argue to the jury that if Audrey had made her turn from the right half of School Street his client could have avoided the collision since Virginia would have had an additional 27½ feet during which she could have taken measures to avoid the mishap.

Such a contention, while meriting commendation for its imaginativeness and ingenuity, simply lacks substance. The 27½-foot figure ignores the fact that if the bus were in the right half of School Street the amount of available space would shrink by one-half. The collision scene sketch as drawn by one of the investigating officers shows the point of collision as being on that part of Church Street which runs along the front of the right half of School Street. Virginia's premise of additional space is based on

---

[4]The exception pertains to traffic proceeding on a one-way street.

her assumption that the jury would accept her version as to what occurred prior to the collision. The jury did not. The foreman's report of "contributory negligence" for both parties clearly indicates that the jury as well as the trial justice did not believe that Virginia was looking at the roadway in front of her as she headed toward the intersection. Rather, they accepted Audrey's statement that Virginia was looking to her left at the people walking through the cemetery. Consequently, we see no prejudicial error in this facet of Virginia's appeal.

The plaintiffs' appeal is denied and dismissed.

*Aram A. Arabian, Frank R. Mazzeo,* for plaintiffs.

*Gunning, LaFazia, Gnys & Selya, Inc., Raymond A. LaFazia, J. Renn Olenn,* for defendants.