**STATE**

v.

**Edward ACQUISTO.**

No. 82–2–C.A.

Supreme Court of Rhode Island.

July 12, 1983.

Dennis J. Roberts II, Atty. Gen., Brian Van Couyghen, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of conviction of first-degree sexual assault entered against him in the Superior Court. The defendant raises five issues in support of his appeal. We affirm the conviction. The facts of the case revealed by the record are as follows.

On September 27, 1979, at about 6:45 a.m. the victim, Christina, was asleep in her apartment in the city of Woonsocket. She was awakened by a loud pounding on her apartment door. A voice from the other side of the door yelled, "Chris, let me in. If you're alone, you let me in. If you're not alone, I'm going to break it'in." Christina recognized the voice as that of Edward Acquisto (Edward), with whom she had had a romantic relationship approximately five months earlier. In the face of Edward's insistence, Christina opened the door. Ed-

ward, upon gaining entrance, seized Christina at the hips, grabbed her hair, and forced her to the floor. She testified that resistance was unavailing and that Edward forced her to have sexual intercourse with him.

At this time Christina was employed as a bartender in an establishment known as the Brass Rail. Following the violent incident, Christina did not call the police but bathed and then went to work about two and a half hours later. At the end of her shift, Christina told the manager of the bar about her experience and finally contacted the police on the evening of September 27. The police took pictures of the gouges on her hips and the bruises on her neck. Christina later testified that prior to trial she had received threatening phone calls from defendant and that on one occasion he had threatened to throw acid in her face if she persisted in coming to court.

The defendant presented evidence of alibi. Two of the alibi witnesses were defendant's mother, Mrs. Julia Griffin, and Mrs. Ann Callahan, both of whom were employed as stipendiary volunteers (senior companions) at the Institute of Mental Health (IMH) during the period in issue.

We shall consider the issues raised by defendant in the order in which they are set forth in his brief. Further facts will be supplied as necessary in order to determine the issues raised.

I

*Were the Payroll Records of Mrs. Griffin and Mrs. Callahan Properly Admitted into Evidence?*

Mrs. Griffin testified that on the morning of September 27 she arose at 5 a.m., as was her custom. She saw her son asleep in his bed and saw his girlfriend, Jacqueline L'Esperance, also asleep on the couch downstairs. Mrs. Callahan came to Mrs. Griffin's home at about 7 a.m. since she and Mrs. Griffin had planned to spend the morning shopping at the Ann & Hope department store. Mrs. Callahan recalled that she saw

Edward when he came downstairs at about 8 a.m. Prior to that time she had heard someone in the shower (presumably it was Edward since everyone else was accounted for). She and Mrs. Griffin both testified that they were home that morning since the employees of the IMH were on strike and therefore they were not able to go to work.

In rebuttal the state presented Mrs. Marie C. Judge who testified that she was the custodian of records for the Department of Elderly Affairs. Part of her duties included the handling of payroll records for senior companions. Mrs. Judge testified that she received payroll vouchers from the IMH which were signed by Mrs. Griffin and Mrs. Callahan. These vouchers were offered in evidence and tended to show that Mrs. Griffin and Mrs. Callahan worked during the morning of September 27. These vouchers further indicated that the strike at the IMH was not in progress on September 27 but had in fact occurred the prior week, September 17 through September 19. The defendant challenges the receipt of these records in evidence on the ground that they do not meet the common-law standards for introduction of business records. The defendant cites *Quint v. Pawtuxet Valley Bus Lines,* 114 R.I. 473, 481, 335 A.2d 328, 333 (1975), as setting forth the following common-law requirements for admissibility of business records:

> "The record maker and each human link in the chain of information, if living and competent, had to testify that the entry was made in the regular course of business in his handwriting or under his immediate supervision and each provider of information contained in the report had to testify. If any necessary witness such as the maker was deemed incompetent or was absent from the jurisdiction at trial time, other witnesses had to identify the record and explain how and by whom it was kept. *State v. Mace,* 6 R.I. 85 (1859)."

The defendant further contends that the common-law test for admission of a business record is still in effect in this state in regard to criminal cases. For this purpose defendant cites *State v. Guaraneri,* 59 R.I. 173, 177, 194 A. 589, 591 (1937). *Guaraneri* dealt with the admission of a hospital record under circumstances wherein impertinent and highly prejudicial matter was allowed into evidence. Thus the trial justice's ruling would have been erroneous even if the record relating to treatment had been properly admitted. *Id.* at 178, 194 A. at 591. Nevertheless, our more recent cases such as *State v. Jamgochian,* 109 R.I. 46, 49–50, 280 A.2d 320, 322–23 (1971) and *State v. Pope,* R.I., 414 A.2d 781, 785 (1980), would give support to defendant's contention that the common-law restriction on introducing a business record is still applicable to criminal cases.

The restriction of the common law in introduction of business records has been roundly criticized by Professor Wigmore in 5 Wigmore, *Evidence* § 1530 at 451–52 (Chadbourn rev. 1974):

> "In such a case, it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be the books of regular entries kept in that establishment; thus the production on the stand of a battalion of bookkeepers, salesmen, shipping clerks, teamsters, foremen, or other employees, should be dispensed with.
>
> " * * *
>
> "Such entries are dealt with in that way in the most important undertakings of mercantile and industrial life. They are the ultimate basis of calculation, investment, and general confidence in every business enterprise. Nor does the practical impossibility of obtaining constantly and permanently the verification of every employee affect the trust that is given to such books. It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by courts of justice."

Similarly, in commenting upon the common-law requirement of authentication, Professor McCormick suggests that

"[i]n light of present business practices, the common law requirement is clearly unreasonable. The complex nature of modern business organizations is such that all participants in the preparation of a record can most often not be identified or, if they can be pinpointed, could not reasonably be expected to have any helpful recollection concerning the specific transactions at issue. Moreover, production of the large numbers of participants that would be required would be a substantial burden on the offering party, a burden not likely to be justified by the benefits to be derived from requiring production of all participants." *McCormick's Handbook of the Law of Evidence* § 312 at 729 (2d ed. Cleary 1972).

A most reasonable balance has been struck in the Federal Rules of Evidence dealing with the introduction of ·business records. Rule 803(6) provides as follows:

"Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

■ We are of the opinion that the time has come for this court to adopt a rule of reason for the introduction of business records in criminal cases and to strike off the meaningless shackles of the common-law requirements for introduction of such records in criminal cases. We are impelled to this conclusion because we believe that the common-law requirement adds nothing to the reliability of the record to be introduced, given the business practices of the twentieth century. Therefore, we adopt the standards set forth in Federal Rule 803(6) for the introduction of business records as evidence in criminal cases. Since the common-law rule was judge-made, this court has the authority to modify such a rule in order to meet changing circumstances and the requirements of modern developments in business and organizational practices. *See, e.g., Ritter v. Narragansett Electric Co.,* 109 R.I. 176, 187, 283 A.2d 255, 261 (1971); *Henry v. John W. Eshelman & Sons,* 99 R.I. 518, 527, 209 A.2d 46, 51 (1965) (Joslin, J., concurring).

■ Applying the standards set forth in Federal Rule 803(6), the foundation laid for introduction of these exhibits was adequate. Mrs. Judge was the custodian of the records. She was responsible for administering payroll. The claim for payment made by the two senior companions and approved by their supervisor was the type of information upon which her payroll records and authorization for payment were based. This is not unlike the circumstances described in 5 Wigmore, *supra,* at § 1530, wherein the custodian of records makes entries on the basis of information given by others. The defendant further objects to the receiving of these payroll vouchers into evidence because they were prepared prior to the making up of the payroll. This circumstance does not constitute a violation of the standards set forth in Federal Rule 803(6). It is specifically provided that a memorandum in any form of acts, events, or conditions made "at or near the time by, or from information transmitted by, a person with knowledge," may be admitted into evidence. In the instant case Mrs. Judge testified that although the vouchers were made up in advance, she would be notified before the payroll was completed in the event that any information contained on the voucher should be changed. In this case no such change was transmitted. Consequently, the

trial justice was not in error in admitting the payroll vouchers into evidence.

## II

*Did the Court Abuse Its Discretion When It Permitted a Defense Witness to be Escorted into the Courtroom by Marshals?*

The defense called Steven Wilson (Wilson) as a witness in order to establish bias on the part of Christina toward defendant. It is undisputed that Wilson had an extensive criminal record dating back more than a decade, including escape and crimes of violence. The attorney for defendant asked that Mr. Wilson be allowed to enter the courtroom without an escort of state marshals. The trial justice did not accede to this request and suggested that in view of the witness's extensive criminal record his current incarceration would not cause any additional adverse inferences to be drawn by the jury.

■ There is no indication that the witness was dressed in prison garb or that he was handcuffed or restrained in any way. In support of his argument defendant cites *State v. Correra,* R.I., 430 A.2d 1251 (1981). In that case one of the defense witnesses was escorted to the witness stand in handcuffs. In passing upon a claim of prejudice, we drew a distinction between handcuffing a prisoner or witness and requiring a defendant to stand trial while dressed in prison garb, a practice condemned by the Supreme Court of the United States in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). In that connection we observed:

> "Understandably, handcuffing must be treated somewhat differently from prison garb because the former provides courtroom security while the latter does not. The trial justice does have a duty, when necessary, to prevent escape, to minimize danger to those attending the trial, and to maintain order in the courtroom as well." *State v. Correra,* R.I., 430 A.2d at 1256.

We are of the opinion that it was well within the discretion of the trial justice to have this prisoner-witness escorted into the courtroom and guarded while there by state marshals. The state did refer to the witness's criminal record in cross-examination. Any additional effect upon his credibility by the presence of marshals would inevitably be minimal and would certainly not outweigh the need for security of the prisoner and the maintenance of order in the courtroom.

It must be borne in mind that a trial for first-degree sexual assault is a highly emotional and tension-fraught proceeding. The presence of a defendant accused of a violent crime (who was not escorted into the courtroom by marshals) combined with a witness possessing an extensive criminal record creates a security risk that the trial justice may well recognize and guard against. We are of the opinion that he did not abuse his discretion in this instance.

## III

*Did the State's Failure to Present Certain Letters Written to the Defendant by the Victim Invalidate the Indictment?*

In April 1979, approximately five months before the alleged sexual assault, Christina wrote two letters to defendant, both of which might be characterized as expressions of enduring love. Prior to consideration of the case by the grand jury, counsel for defendant requested that these letters be presented by the prosecutor at the time the grand jury considered the case. Apparently, the assistant attorneys general who were first contacted promised to do so. One of them instructed representatives of the Woonsocket police to present the letters at the time that the grand jury would hear the case. For some unknown reason the Woonsocket police did not obtain the letters. The case was presented by an assistant attorney general who was unaware of the promise, and therefore the grand jurors did not have these letters presented to them.

As a result of this omission, defendant moved to dismiss the indictment, claiming that these letters were exculpatory and

tended to show bias against defendant. A justice of the Superior Court denied the motion, observing that the letters were not exculpatory but merely suggested a relationship or a feeling of the victim toward defendant and that the prosecution was under no duty to present such evidence to the grand jury.

In Rhode Island it has traditionally been the function of the grand jury to decide whether the evidence presented to it, unexplained and uncontradicted, gives rise to a sufficient quantum of proof to warrant the return of a formal accusation of crime. A grand jury proceeding is not a trial and is not bound by the rules of evidence that apply to an adversary hearing. *See United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The Supreme Court of the United States has consistently refused to pass upon the adequacy or competence of evidence presented to the grand jury. In *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), an indictment was sought to be quashed because the evidence presented to the grand jury consisted entirely of hearsay statements by government witnesses. In passing upon this challenge, Mr. Justice Black observed:

> "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough

to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Id.* at 363, 76 S.Ct. at 408–09, 100 L.Ed. at 402–03.

The court went on to decline to exercise its supervisory power to establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. Justice Black suggested that such a rule would run counter to the whole history of the grand jury institution in which laymen conduct their inquiries unfettered by technical rules. Although some federal courts of appeal have chosen to exercise supervisory power to scrutinize the nature and quality of evidence presented to the grand jury, *see, e.g., United States v. Chanen,* 549 F.2d 1306 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977); *United States v. Leibowitz,* 420 F.2d 39 (2d Cir. 1969), we are of the opinion that the better rule is that enunciated by the Supreme Court in *Costello, supra,* and followed in *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), and *United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). Consequently, assuming, without deciding, that the letters in question tended to be exculpatory,[1] we believe that the failure to present these letters did not constitute cause to invalidate the indictment. We therefore conclude that the justice of the Superior Court did not err in declining to dismiss the indictment on the ground of failure to present the letters in question.

### IV

*Did the Trial Justice Err When He Denied the Defendant's Motion to Dismiss the Indictment Challenging the Composition of the Grand Jury?*

The defendant was arraigned on November 14, 1979. Ten months later on Septem-

---

1. The exculpatory theory asserted by defendant is that these letters tended to establish bias on the part of Christina and might impeach her credibility. The appropriate area in which to establish a witness's bias or to impeach a witness's credibility is in the trial of a criminal action where the full panoply of adversary safe-guards is applied in favor of a defendant. To move these procedural safeguards into the grand jury room would create, in the words of Mr. Justice Black, an "interminable delay but add nothing to the assurance of a fair trial." *Costello v. United States,* 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397, 403 (1956).

ber 17, 1980, defendant challenged the composition of the grand jury because of the exemption then granted to college students and professors pursuant to the provisions of General Laws 1956 (1969 Reenactment) § 9–9–3.[2] This motion was not argued until April 27, 1981, the date scheduled for commencement of the trial. The trial justice held that the motion was untimely but permitted defendant to make an offer of proof by eliciting testimony showing the statistical foundation for the argument. At the conclusion of the offer of proof the trial justice did not modify his earlier denial of the motion.

■ In the light of the requirement of Rule 12(b)(3) of the Superior Court Rules of Criminal Procedure that a motion challenging the validity of an indictment be made no later than twenty-one days after a plea is entered, we cannot say that the court abused its discretion in holding that a delay of ten months was not reasonable.

■ In any event, we determined in *State v. Courteau,* 461 A.2d 1358 (1983) that the granting of an exemption as opposed to the exclusion condemned in *State v. Jenison,* R.I., 405 A.2d 3 (1979), did not constitute a deprivation of a defendant's right to be indicted by a grand jury that represents a reasonable cross section of the community. *See Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Thus, the trial justice did not err in denying defendant's motion to dismiss the indictment.

V

*Was the Trial Justice in Error in Admitting Evidence of Threats Made by the Defendant to Christina Maloney Subsequent to the Alleged Sexual Assault?*

Prior to trial defendant filed a motion in limine to prevent the state from introducing testimony relative to a series of tele-

phone calls allegedly made by defendant to Christina several months after the alleged sexual assault. The trial justice reserved decision on the motion until the point at which this evidence was offered at trial. He then overruled the objection and admitted testimony by Christina concerning three telephone calls that she received on or about February 20, 1980. She testified that during the first call defendant indicated that he would throw acid in her face if she were to "keep going to court." She could not recall specifically what he said during the second and third calls, except that the third call was similar in nature to the first call and contained threats.

■ The defendant objects to the admission of this evidence on the ground that it constitutes evidence of a separate crime and is therefore not admissible. It is true that evidence of prior or subsequent criminal activity designed to show a predisposition on the part of a defendant to commit the crime with which he is charged is generally excluded. *State v. Burke,* R.I., 427 A.2d 1302 (1981); *State v. Colvin,* R.I., 425 A.2d 508 (1981); *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978); *State v. Colangelo,* 55 R.I. 170, 179 A. 147 (1935). Nevertheless, evidence of a separate crime may be admissible if it has independent relevance in respect to the proof of an element material to "the chain of proof of the crime in issue." *Id.* at 174, 179 A. at 149.

The overwhelming weight of authority supports the proposition that threats made to a witness with the intent to induce such witness not to appear to testify against the accused are admissible in evidence because such threats or any effort by the accused to suppress or destroy evidence is relevant as a circumstance tending to show guilt. *See, e.g., State v. Belkner,* 117 N.H. 462, 469, 374 A.2d 938, 942 (1977); *State v. Hill,* 47 N.J. 490, 500–01, 221 A.2d 725, 731 (1966); *Commonwealth v. Klick,* 272 Pa.Super. 61, 66, 414 A.2d 669, 672 (1979); 1 *Wharton's Crim-*

---

**2.** On May 15, 1980, the academic exemption was abolished pursuant to P.L. 1980, ch. 242, § 2. However, the grand jury panel that re-

turned defendant's indictment had been selected in accordance with the statute prior to the amendment.

inal *Evidence* § 217 at 465 (Torcia 13th ed. 1972); 2 Wigmore, *Evidence* §§ 277–78 at 119–25 (3d ed. 1940); *annot.* 62 A.L.R. 136 (1929).

 Although Rhode Island does not have a case directly in point, we have held that activities inconsistent with the defendant's claim of innocence, such as flight, constitute circumstances bearing on the question of guilt. *In re Caldarone,* 115 R.I. 316, 326, 345 A.2d 871, 876 (1975); *State v. Ouimette,* 110 R.I. 747, 774, 298 A.2d 124, 139 (1972). As a consequence, although the threat to a witness may well have constituted an independent crime pursuant to the witness-intimidation statute, G.L. 1956 (1981 Reenactment) § 11–32–3, its independent relevance to prove a circumstance indicating consciousness of guilt on the part of the defendant causes it to be admissible in evidence. This admissibility is not subject to the reasonable-necessity requirement applicable to evidence of prior sex crimes in a sex-offense case, explicated in *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978).[3] As we said in *State v. Cline,* R.I., 405 A.2d 1192, 1210 (1979), a defendant has no right to be insulated from relevant truths "even if such truths might lead the jury to draw less favorable inferences concerning defendant than if they were not exposed." The trial justice was not in error in admitting evidence of threats made to the state's principal witness.

For the reasons stated, the appeal of the defendant is denied and dismissed, and the judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

---

**3.** In *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978), we emphasized the prejudicial effect of the introduction of evidence of prior sex crimes in a case wherein the defendant is charged with sexual assault. In order to allow introduction of such evidence, we required the establishment of two criteria. First, it was necessary to demonstrate independent relevance and secondly, it was necessary to show reasonable necessity. *Id.* at 627, 382 A.2d at 533. In respect to non-sexual crimes, only independent relevance must be shown and the reasonable-necessity requirement is not a condition precedent to the introduction of such evidence.