**STATE**

v.

**Kevin C. LANIGAN.**

**Nos. 85–116–M.P., 85–363–C.A.**

Supreme Court of Rhode Island.

June 26, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Annie Goldberg, Asst. Attys. Gen., Providence, for plaintiff.

Robert B. Mann, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This is a consolidated appeal.[1] In action No. 85–363 C.A., the defendant appeals from a Superior Court jury conviction for first-degree murder and assault with intent to murder. The defendant's motion for new trial was denied and he was sentenced to mandatory life imprisonment for the murder and twenty years for the assault, the sentences to run consecutively.

In action No. 84–116 M.P., we granted defendant's petition for certiorari from a Superior Court revocation-of-probation determination. At the time the murder and assault charges were lodged against him, defendant was also on probationary status. Because of the murder and assault charges, a probation-violation hearing was conducted and defendant was subsequently adjudged a violator of his probation and

---

1. Case No. 85–363 C.A. is here on direct appeal whereas case No. 84–116 M.P. is here on the defendant's petition for certiorari. By order of this court dated June 6, 1985, the cases were consolidated for briefing and oral argument.

ordered to serve the remaining seven years of his suspended sentence.[2] We affirm both the conviction and the probation-revocation judgment.

We shall discuss the appeal of each action separately, beginning with the conviction. The underlying facts supporting both the conviction and the revocation judgment are these.

The murder and assault incidents took place on May 20, 1983, at an establishment known as the Corner Pub on Chalkstone Avenue in Providence. On the afternoon of May 19, 1983, defendant, Kevin C. Lanigan (Lanigan), was picked up at his girlfriend's home by codefendant turned state's witness, David Libutti.[3] The two drove around the city of Providence for a few hours in an orange car belonging to Libutti's mother before stopping at a liquor store to purchase beer and brandy. They spent the next couple of hours drinking.

Lanigan and Libutti then drove to see a friend of Lanigan's named Daley. Daley and his wife lived on Chalkstone Avenue across from the Corner Pub (the Pub). The conversation at the Daleys' home included a discussion of the fact that a friend of the Daleys had been thrown out of the Pub the night before by the Pub's owner, Peter Carroll (referred to in the indictment as Edwin P. Carroll, but commonly known as Peter Carroll), after spending $30 there on alcoholic beverages. Lanigan himself had been barred from drinking at the Pub by Carroll after an incident the previous summer that left Lanigan harboring resentment toward Carroll.

Leaving the Daleys' residence at about 8 p.m., Lanigan and Libutti traveled to the home of Robert Brennan on North Main Street in Providence. Lanigan asked for and obtained a small black .38-caliber handgun and a nylon stocking from Brennan and his girlfriend. He checked the gun chamber to make sure it was loaded, secured the gun in the waistband of his pants, and left Brennan's house with Libutti.

Returning to the car, Lanigan informed Libutti of his intention to rob Peter Carroll's bar. He ordered Libutti to drive to the Pub and threatened to shoot Libutti in the head if he refused. Libutti drove to the Pub, and they parked in the street next to the bar; but after about a half hour of sitting in the car, Lanigan fell asleep. Libutti drove back to Robert Brennan's house, removed the gun and stocking from the sleeping Lanigan and returned them to Brennan. Then he drove Lanigan back to Lanigan's girlfriend's house and woke him.

Upon waking, Lanigan became upset. He ordered Libutti to return to Brennan's house so that he could retrieve the gun and stocking. Having regained the gun from Brennan, Lanigan returned to the car, pointed the gun at Libutti, and told him to drive back to the Pub or he would kill him. Libutti complied. Once back at the Pub, Lanigan stated that he was going to fire over Carroll's head. He instructed Libutti to drive around the block and pick him up in a few minutes. Lanigan, wearing Libutti's plaid shirt and tan scarf, then left the car and headed toward the Pub.

Libutti, following instructions, drove slowly around the block. Moments later, as he came up the street toward Chalkstone Avenue, he heard gunshots ring out. Lanigan soon emerged about twenty feet away, running toward the car with the gun in his hands. He jumped into the car and directed Libutti to drive down a side street off Chalkstone Avenue. He then told Libutti to head back to the Pub, stating that he had just killed Peter Carroll and wounded Manuel Correia and that he had to return to the bar to finish off Correia. Libutti again obliged Lanigan.

2. In June 1977, defendant was sentenced to ten years for assault with a dangerous weapon, three years to serve at the Adult Correctional Institutions (ACI), seven years suspended, and seven years' probation to commence upon his release from the ACI.

3. Libutti was initially charged, along with defendant, with murder and assault with intent to murder. Prior to trial, however, Libutti pleaded nolo contendere to an amended charge of harboring a criminal and was given a five-year suspended sentence with five years' probation in exchange for testifying against Lanigan.

At trial Manuel Correia and his girlfriend, Donna Clarke, testified that they were the last ones to leave the bar that night. Peter Carroll remained behind to close up. Correia and Clarke walked out of the bar at about 12:20 a.m. on May 20 and went up to their second-floor apartment above the bar. Five to ten minutes later they heard a gunshot originating from the bar below. Correia went down to investigate.

When he entered the bar, Correia observed Lanigan standing on the ledge in the middle of the bar near the cash register. He asked Lanigan where Carroll was, to which Lanigan replied that Carroll was in the back room. Correia became uneasy when he failed to locate Carroll in the back so he decided to leave the premises. As he passed Lanigan on his way out, Lanigan told Correia that he could join his friend. Correia turned to see a black object coming toward his face, put his hands up to protect himself, felt a burning, stinging sensation through the side of his head, and fell to the floor. Looking up, Correia saw Lanigan standing over him, pointing a gun at his face. Correia reached for the gun and a struggle ensued. Correia was able to get to his feet and knock Lanigan sufficiently off balance to enable him to run away. Lanigan fired a second shot at Correia as he ran from the bar.

Once outside, Correia hid behind a car. Only after he observed Lanigan run down Chalkstone Avenue did Correia return to the bar. There he discovered Carroll bleeding on the floor behind the bar and called the police.

Meanwhile, Lanigan returned to the bar but was unable to get past the door. Donna Clarke testified that from the front parlor windows of the second-floor apartment, she saw a man emerge from an orange car carrying a handgun and running toward the bar. She heard the driver of the car tell the armed man to hurry because someone was watching from the second-floor window. Clarke did not wait to see if the

orange car and the two men left; she went to the bedroom to call the police.

Libutti was arrested by the Providence police later that morning; Lanigan turned himself in to the police four days later.

Lanigan raises a host of issues in the appeal of his murder-and-assault conviction, few of which merit discussion. Additional facts will be supplied where necessary.

I

The first issue raised by Lanigan concerns the testimony of Colleen Brennan. On Friday, April 19, 1985, the case against Lanigan got under way; the state's first witnesses were called the following Monday, April 22, 1985. On Wednesday morning, April 24, 1985, the state supplied defense counsel with the statement of Colleen Brennan [4] together with notice of the state's intention to call Ms. Brennan as a witness. The defense moved to preclude her testimony as a sanction for the state's violation of Rule 16 of the Superior Court Rules of Criminal Procedure. In response the trial justice conducted a voir-dire hearing.

The evidence presented at the hearing indicated that on Monday, April 22, 1985, a regional agent of the Federal Bureau of Investigation (FBI), John Roberson, Jr., received a telephone call from a confidential informant who told the agent that after Lanigan shot Carroll and Correia, he went to Colleen Brennan's home at Crook Manor, Pawtucket, and swapped the gun for cocaine. Thereafter, the informant claimed, Lanigan and Ms. Brennan stayed high on drugs for three days before Lanigan contacted a lawyer and turned himself in.

The tip supplied to agent Roberson meant nothing to him because he knew nothing about the Lanigan investigation or trial. Nevertheless, he asked the informant to find out where Ms. Brennan currently resided. Agent Roberson then called the Providence Police Department and informed Detective Jack McCaughey

4. According to the testimony of Detective Jack McCaughey, Colleen Brennan is not related to Robert Brennan.

that a confidential source had said that Ms. Brennan might be of some help in the Lanigan trial but that he did not have an address where she could be located.

On Tuesday Detective McCaughey told the prosecutor about Ms. Brennan's existence but explained that her whereabouts were still unknown. Early that afternoon, however, Agent Roberson received Ms. Brennan's telephone number from the informant and passed it on to McCaughey's partner. McCaughey and his partner tried several times without success to reach Ms. Brennan at the telephone number. Thereafter, they drove out to the administrative building of the Hartford Projects and obtained her address but found her not to be at home. Finally, after returning to the police station, they successfully contacted her by telephone at about 4 p.m. She agreed to provide the police with a statement. By 6:30 p.m. on Tuesday, a statement had been obtained from Ms. Brennan and the prosecutor notified. A copy of the statement was delivered to both the prosecutor and the defense the next morning.

The trial justice, at the conclusion of the voir-dire hearing on Thursday, April 25, denied Lanigan's motion to preclude Ms. Brennan's testimony. He found, contrary to Lanigan's assertion, that the Providence police had conducted a diligent investigation,[5] that the information regarding Ms. Brennan's existence came to the attention of the police by happenstance only after an FBI informant had tipped off the FBI about her existence, that the police acted promptly to interview Ms. Brennan once they had her address and telephone number, and that they promptly disclosed the

information to the defense. The trial justice reasoned, therefore, that the state had fully complied with Rule 16(a).

Following the trial justice's denial of the motion to exclude Ms. Brennan's testimony, Lanigan moved to pass the case, claiming that the ruling violated his right to discovery; deprived him of due process, effective cross-examination, and effective assistance of counsel; and constituted an intentional provocation of mistrial by the state. The trial justice again denied the defense motion, citing *State v. Babbitt*, 457 A.2d 1049 (R.I.1983). The defense then moved for a thirty-day continuance in order to prepare for the state's supplemental discovery. The trial justice deemed thirty days to be excessive and granted Lanigan a four-day continuance until Monday, April 29.

On appeal Lanigan claims that the trial justice erred in finding no Rule 16 violation, permitting Ms. Brennan to testify, refusing to grant him a mistrial, and denying him a thirty-day continuance. We cannot agree.

■ Under the dictates of Rule 16(a), upon the defendant's request, the prosecution is required to permit the defendant to review and copy certain enumerated material in the possession or control of the state, materials that are either known by the prosecution to exist or which "by the exercise of due diligence may become known" to the prosecution. Super.R. Crim.P. 16(a).[6] The question of whether the prosecution has used "due diligence" to discover and disclose the enumerated material is a mixed question of law and fact to

---

**5.** The state on April 24, 1985, filed supplemental discovery, including a statement taken from Robert Brennan on November 18, 1983. The statement by Robert Brennan indicated that Lanigan returned to Brennan's home after the shooting and stayed for the rest of the night and that the next morning Brennan drove Lanigan to Crook Manor in Pawtucket where he left Lanigan. Defense counsel at trial argued that the police should have discovered the existence of Ms. Brennan earlier because Robert Brennan told the police that he had dropped Lanigan at Crook Manor. The failure of the police to investigate Lanigan's travels and activities after having been dropped at Crook Manor, accord-

ing to the defense, demonstrated a lack of due diligence under Super.R.Crim.P. 16(a).

**6.** Rule 16(a) states in pertinent part:

"Discovery and inspection.—(a) Discovery by Defendant. Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State * * *."

be determined by the trial justice. The resolution of such mixed questions by the trial justice is entitled to the same deference as his or her factual findings. *Morgan v. City of Warwick*, 510 A.2d 1297 (R.I.1986). The trial justice's findings and conclusions will be accorded great weight and will not be disturbed by this court on appeal unless it is demonstrated that such determinations are clearly wrong or that the trial justice overlooked or misconceived material evidence. *Id.* at 1299; *Martin v. Wilson Publishing Co.*, 497 A.2d 322, 326 (R.I.1985).

■ Applying this standard to the matter before us, we conclude that the trial justice's determination that the state had acted with due diligence and in good faith in its investigation of Ms. Brennan and, therefore, that no Rule 16 violation had occurred was reasonable and not clearly erroneous. We find the situation presented in this case to be analogous to that in *State v. Babbitt*, 457 A.2d 1049 (R.I.1983).

In *Babbitt* the prosecution notified the defendant of its intention to introduce an inculpatory statement made by the defendant to the sister-in-law. That notice was given two days before the statement was introduced into evidence. As in this case, the defendant claimed a Rule 16 violation and moved to preclude the testimony of the sister-in-law. The trial justice conducted a voir-dire hearing on Babbitt's motion and subsequently refused to preclude the sister-in-law's testimony because he found no Rule 16 violation.

In support of his determination that no violation had occurred, the trial justice in *Babbitt* found that neither the prosecutor nor the police had the substance of the sister-in-law's testimony in their possession when the case was being prepared for trial; the police did not deliberately attempt to

keep the information from the defendant or the prosecutor; and the sister-in-law's testimony could not have been discovered through the exercise of due diligence. 457 A.2d at 1051. We declared the trial justice's determination that the state acted with due diligence to be reasonable and affirmed his decision.[7]

Here the evidence established that neither the police nor the prosecutor knew of the existence of Ms. Brennan, nor could they have known of her existence prior to the commencement of the trial. Once the police received information of her existence from the FBI and tracked her down for a statement, they promptly informed the prosecutor and defense counsel. Moreover, there is no evidence to suggest that the police acted with anything but due diligence in investigating this case. Lanigan's assertion that Robert Brennan's statement should have prompted the police to interview all the residents of the Crook Manor housing project is unpersuasive since the statement only indicated that Lanigan had been dropped off at Crook Manor and not that he had intended to remain there for any length of time.[8] We believe, as the trial justice found, that absent the informant's tip, the police could not reasonably have been expected to discover Ms. Brennan, even with their diligent investigative efforts.

■ With regard to Lanigan's claim that the trial justice should have granted him a mistrial, we reiterate that the decision to grant a mistrial is relegated to the sound discretion of the trial justice, *State v. Fernandes*, 526 A.2d 495 (R.I.1987), and absent clear error or abuse will not be disturbed by this court on appeal. *State v. Brown*, 522 A.2d 208 (R.I.1987).

Since we find the trial justice to have been correct in his determination that no

---

7. Although we affirmed the trial justice's determination in *State v. Babbitt*, 457 A.2d 1049 (R.I. 1983), with regard to due diligence, we never explicitly discussed the standard of review to be accorded the trial justice's decision on such a mixed question of law and fact. Rather, we cited *State v. Darcy*, 442 A.2d 900, 902 (R.I. 1982), for the standard of review to be applied in examining the trial justice's imposition of

sanctions under Rule 16, that is, abuse or improper exercise of sound discretion. 457 A.2d at 1052.

8. Detective McCaughey testified that the Crook Manor housing project comprises ten to twelve buildings, each containing multiple apartment units.

violation of Rule 16 occurred, we cannot conclude that he abused his discretion in denying Lanigan's motion for mistrial as a sanction for a discovery violation. Nor was the trial justice wrong in denying the mistrial motion on the basis of deprivation of due process, cross-examination, or effective assistance of counsel or on the intentional-provocation theory set forth by Lanigan.

■ Lanigan's final point regarding the presentation of Ms. Brennan as a prosecution witness relates to the denial of the motion for a thirty-day continuance. The grant or denial of a motion for continuance is also left to the trial justice's sound discretion and will not be reversed absent an abuse of that discretion. *Gormley v. Vartian,* 121 R.I. 770, 774–75 n.1, 403 A.2d 256, 258 n.1 (1979).

In *Babbitt* the defendant also attacked the introduction of his admission on constitutional grounds, alleging that the failure to preclude the sister-in-law's testimony deprived him of his right to a fair trial. We acknowledged that in some circumstances a belated disclosure of inculpatory statements made prior to trial, even though not in violation of Rule 16, might jeopardize a defendant's right to due process and effective assistance of counsel. *Babbitt,* 457 A.2d at 1052. We further noted that the first essential of a fair trial is to ensure a reasonable time for the defendant to prepare a defense adequately and that granting defense counsel additional time through a continuance was an appropriate procedural safeguard to be used in balancing the defendant's right to a fair trial against the probative value of the inculpatory evidence. *Id.* at 1053.

In this case, Lanigan asked for a lengthy continuance because the statement by Ms. Brennan regarding the purchase and use of drugs during the three days he hid away caused defense counsel to reevaluate the defense of diminished capacity or insanity. The trial justice stated that he did not see how this new revelation affected the defense's strategy of diminished capacity or insanity when Lanigan had Libutti's testimony pertaining to the ingestion of drugs

and alcohol. Moreover, Ms. Brennan's statement would have no bearing on the defense of diminished capacity because the ingestion of drugs at her home came after the murder and assault were committed. We, too, profess our failure to discern Lanigan's argument on this matter. Consequently, we find that the trial justice adequately protected Lanigan's rights by affording him a four-day continuance.

■ The second issue raised by Lanigan is related to the events of the first issue, and it concerns the trial justice's refusal to compel the disclosure of the confidential FBI informant. Ms. Brennan, in an out-of-court interview with defense counsel, allegedly denied getting high on drugs for three days with Lanigan. Lanigan argues that the informant's identity and possible testimony pertaining to the consumption of drugs would have been helpful in his efforts to impeach Ms. Brennan. Therefore, the trial justice erred in denying disclosure.

We discussed the informant privilege in *State v. Anil,* 417 A.2d 1367 (R.I.1980). The public interest in effective law enforcement requires that the identity of confidential government informants be withheld. *Id.* at 1370. However, the scope of this privilege is by no means absolute. One recognized exception to the rule of nondisclosure applies either when the informant actively participates in setting up the crime and is present at its commission or when the informant actually takes part in the crime. *Roviaro v. United States,* 353 U.S. 53, 64–65, 77 S.Ct. 623, 629–30, 1 L.Ed.2d 639, 647 (1957). But "where the informant merely brings the defendant together with the authorities and takes no active role in the commission of the crimes charged, no disclosure of his identity is required because [the informant's] testimony could only be peripheral." *State v. Anil,* 417 A.2d at 1371.

Applying the *Anil* standard to this case, we find it evident that the informant played no role in the commission of the murder and assault with intent to murder; therefore, his testimony clearly could only have been of tangential import. As for Lani-

gan's argument that he was entitled to know the informant's identity in order to impeach Ms. Brennan, even assuming for argument's sake that the informant had firsthand knowledge of Ms. Brennan's consumption of drugs during the three-day hiatus, if she denied that fact during her cross-examination, as she is alleged to have done during her out-of-court interview, the defense would not have been permitted to call the informant to impeach her anyway. *See State v. Bowden,* 439 A.2d 263, 268 (R.I.1982) ("[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence[;] [t]he cross-examiner is restricted to the answers of the witness"). For these reasons, we believe the trial justice properly balanced Lanigan's need to know the informant's identity against society's interest and correctly denied disclosure.

Lanigan next attacks his conviction, claiming that the grand jury indicted him on a felony-murder theory but that the state proceeded at trial on a premeditated-murder theory.[9] Lanigan contends that the grand jury transcripts, as well as the state's bills of particulars, demonstrate that the state presented this case to the grand jury on a felony-murder theory and that the grand jury returned an indictment only for felony murder. According to Lanigan, the trial justice erred in permitting the state to broaden the indictment to include a premeditated-murder theory. We disagree.

Lanigan relies on *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), and *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), to support his position that an indictment charging felony murder and returned by a grand jury may not be amended by the prosecution to broaden the charge to include premeditated murder unless the case is resubmitted to the grand jury and the grand jury reindicts on the amended charges.

In *Stirone* the indictment charged that the defendant had engaged in extortion to obstruct shipments of sand from outside Pennsylvania into the state where it was to be used in the construction of a steel mill. At trial the prosecutor's proof went beyond the alleged offense of obstructing sand shipments and established that the defendant had also obstructed the steel mill's eventual export of steel out of Pennsylvania.

The Supreme Court, citing *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), for the proposition that a court cannot permit a defendant to be tried on charges that are not contained in the indictment against him, reversed the conviction. The Court reasoned that Stirone's conviction might have been based on the evidence of obstructing steel exports, an element of an offense not charged in the indictment, and that the resulting variance between the prosecution's proof at trial and the indictment constituted an unconstitutional broadening of the indictment that destroyed the defendant's right to be tried only on the charges presented in the indictment returned by a grand jury. 361 U.S. at 217, 80 S.Ct. at 273, 4 L.Ed.2d at 257.

*United States v. Miller,* on the other hand, presents an entirely different scenario. In *Miller* the defendant was indicted for defrauding his insurer both by consenting in advance to the burglary of his business and by lying to his insurer about the value of the stolen property. At the trial, however, the government successfully moved to strike the part of the indictment that alleged prior knowledge of the burglary and focused its proof only on the latter charge.

On appeal Miller complained that the indictment impermissibly charged more than was necessary. The Supreme Court rejected this argument with much of its discussion relating to a review of *Ex parte Bain*

---

**9.** It appears that defendant is not attacking the sufficiency of the indictment so much as he is claiming a fatal variance between the indictment and the evidentiary proof at trial. However, to the extent that defendant's argument touches on the claim of a defective indictment,

we simply reiterate our adherence to the rule that it is not the court's role to scrutinize and pass upon the adequacy or competence of evidence presented to the grand jury. *State v. Acquisto,* 463 A.2d 122, 127 (R.I.1983).

and its progeny. Noting the long-recognized principle that an indictment may charge numerous offenses or the commission of any one offense in several ways, *see, e.g., Ford v. United States,* 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926), and that each offense whose elements are fully set out in an indictment can independently sustain a conviction, *see, e.g., Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610, 625–26 (1970), the Court concluded that the narrowing of an indictment by the failure at trial to prove each separate offense charged does not render the indictment unconstitutionally void. *United States v. Miller,* 471 U.S. at 144, 105 S.Ct. at 1819, 85 L.Ed.2d at 110. "[T]here can be no showing here that Miller was prejudicially surprised at trial by the absence of proof concerning his alleged complicity in the burglary; nor can there be a showing that the variance prejudiced the fairness of the respondent's trial in any other way." *Id.* at 134–35, 105 S.Ct. at 1814, 85 L.Ed.2d at 104.

■ While we do not dispute the holdings in either *Stirone* or *Miller,* we also do not find them to be particularly applicable in this case because there was no variance between Lanigan's indictment and the proof at trial. The indictment returned by the Providence County grand jury against Lanigan charged as follows:

"The Grand Jury of the State of Rhode Island and Providence Plantations charges that on or about the 20th day of May, 1983 at Providence in the County of Providence, Kevin C. Lanigan, alias John Doe, and David K. Libutti, alias John Doe, both of Providence County, did murder Edwin P. Carroll, in violation of Section 11–23–1 of the General Laws of Rhode Island, 1956 as amended (Reenactment of 1981).

### COUNT II

That Kevin C. Lanigan, alias John Doe, of Providence County on or about the 20th day of May, 1983, at Providence in the County of Providence, assaulted Manuel Correia with intent to murder him in violation of Section 11–5–1 of the General Laws of Rhode Island, 1956, as amended (Reenactment 1981)."

Our statutory definition of murder is contained in G.L. 1956 (1981 Reenactment) § 11–23–1, which reads:

"Murder.—The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing, or committed in the perpetration of, or attempt to perpetrate any arson or any violation of §§ 11–4–2, 11–4–3 or 11–4–4 of the general laws, rape, burglary or robbery, or while resisting arrest by, or under arrest of, any state trooper or policeman in the performance of his duty; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed is murder in the first degree. Any other murder is murder in the second degree. The degree of murder may be charged in the indictment or information, therefor, and the jury may find the degree of murder, whether the same be charged in the indictment or information or not, or may find the defendant guilty of a lesser offense than that charged in the indictment or information, in accordance with the provisions of § 12–17–14."

In this jurisdiction, the Legislature eliminated the need for strict technicality in criminal pleading when it enacted chapter 12 of title 12 of the 1956 General Laws. *State v. Raposa,* 100 R.I. 516, 519, 217 A.2d 469, 471 (1966). Under G.L. 1956 (1981 Reenactment) § 12–12–1.4, an indictment is valid and sufficient for the purpose of giving notice to a defendant if the offense is charged either "by using the name given to the offense in terms of either the common law or by statute" or "by stating the definition of the offense in terms of substantially the same meaning." [10]

---

**10.** General Laws 1956 (1981 Reenactment) § 12–12–1.4 states:

Therefore, the fact that Lanigan's indictment referred to § 11–23–1 and stated that he "did murder" was constitutionally sufficient to give notice to Lanigan of a pending charge for first-degree murder based on a premeditation theory. *See State v. Domanski,* 57 R.I. 500, 504, 190 A. 854, 857 (1937) (accused has constitutional right to be informed of accusation against him and the short-form-indictment statute satisfies this constitutional guarantee). The definition of the term "murder" as used in Lanigan's indictment encompasses everything contained in § 11–23–1, and the state need not specify on the face of the indictment the degree or theory of murder. *State v. Jefferds,* 89 R.I. 272, 280, 152 A.2d 231, 235 (1959). Consequently, it cannot be said that the indictment only charged Lanigan with felony murder.

As for the proof at trial, the prosecution established that Lanigan had had a prior altercation with the murder victim, that bitter feelings over this incident still gripped Lanigan, that Lanigan borrowed a gun from a friend on the night of May 19, that he went to the bar twice that night with the intent to fire the gun over the victim's head, and that on the second visit he murdered Peter Carroll. This evidence was certainly enough to support a jury conviction for premeditated murder.

Since the indictment charging Lanigan with murder implicitly embraced the theory of premeditated murder and since the proof at trial was sufficient to support that theory, we find no variance between the charging instrument and proof to warrant reversal.

Of course, a defendant is entitled to utilize our liberal rule of criminal discovery,

Rule 16, as well as request a bill of particulars, Rule 7(f), to flesh out the general terms of the indictment with more detailed information about the circumstances of the offense. *State v. McParlin,* 422 A.2d 742 (R.I.1980). And in fact, Lanigan did just that. If the motion for a bill of particulars is granted, the factual allegations contained in the bill would limit the state's case at trial in the same manner as the factual allegations in the indictment; the rules governing variance between proof and pleading apply to the bill of particulars just as they do to an indictment or information. LaFave & Israel, *Criminal Procedure* § 19.2(f) at 717 (1985).

In this case the state amended its original bill of particulars to indicate its ambivalence over the question of whether to classify this case as one of felony murder to the exclusion of all else.[11] Lanigan does not raise, nor do we address, the question of whether the state was bound by its original response. We merely observe that a bill of particulars, by the terms of Rule 7(f), may be amended "at any time subject to such conditions as justice requires." *Cf. United States v. Johnson,* 575 F.2d 1347 (5th Cir.1978) (a bill of particulars may be amended at any time and the decision to allow the amendment is within the discretion of the trial justice and will not be reversed absent a showing of prejudice or a clear abuse of discretion). The proof at trial not having conflicted with the amended bill of particulars, we find no unconstitutional variance.

After having reviewed Lanigan's remaining grounds for the appeal of his conviction, it is our considered opinion that they are without merit and deserve no discussion. Consequently, Lanigan's appeal of

---

"Contents of indictments, informations and complaints.—An indictment, information or complaint shall be a plain, concise and definite written statement of the offense charged. An indictment, information or complaint which provides the defendant and the court with adequate notice of the offense being charged shall be sufficient if the offense is charged either (a) by using the name given to the offense in terms of either the common law or by statute or (b) by stating the definition of the offense in terms of substantially the same meaning."

11. Subsequent to the issuance of the indictment, Lanigan filed a motion for a bill of particulars pursuant to Super. R. Crim. P. 7(f), which was granted by the trial court. The state's bill of particulars, which was filed in May 1984, indicated that the state believed this to be a case of felony murder. In January 1985, however, the state amended its original response to indicate that it did not know "whether or not this is a case of felony murder."

his conviction in No. 85–363 C.A. is denied and dismissed, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.

## II

We now take up Lanigan's petition for certiorari in case No. 84–116 M.P. regarding the violation of probation. Lanigan raises two issues, the first of which concerns the trial justice's decision to grant only a one-day continuance to allow defense counsel to aid in the preparation of Lanigan's violation case. The second issue involves the same trial justice's refusal to recuse himself from the violation hearing.

A review of the record discloses that Lanigan appeared before a justice of the Superior Court on May 27, 1984. At that time a combined bail and violation hearing was scheduled for June 10, 1984, and a hearing to determine a defense counsel was scheduled for June 3, 1984. On June 3, 1984, the same trial justice was informed that Lanigan refused assistance from the Public Defender's office because of some past experience. Lanigan refused to disclose the nature of the prior experience or the name of the public defender involved so the trial justice, in light thereof, declined to appoint counsel other than the Public Defender and allowed Lanigan to proceed pro se.

The next appearance in court by Lanigan came on June 10, 1984, before a second justice of the Superior Court, on the combined bail and violation hearing. Lanigan reiterated his refusal to accept the Public Defender's office as legal counsel. The court informed Lanigan that the case could go forward with Lanigan representing himself but that the court would require an attorney from the Public Defender's office to be present to answer any of Lanigan's legal questions. Thereafter, Lanigan asked for and received a postponement of the violation hearing until June 27, 1984.

On June 27, 1984, Lanigan was back before the first trial justice. Again he asked for a continuance, complaining that

he was not prepared to go forward because he could not get the legal materials he needed from the ACI.[12] The trial justice granted the continuance until August 16, 1984, and ordered the Public Defender's office to talk to Lanigan and assist him in obtaining what he needed, if he was so entitled.

On August 16, 1984, Lanigan once again indicated that he was unprepared to go forward and was unsure of the complexities in the case and asked for another postponement. The third trial justice denied Lanigan's request, citing defendant's refusal to be represented by the Public Defender. The state then called its first witness, Manuel Correia.

At the conclusion of Correia's direct testimony, the trial justice invited the attorney from the Public Defender's office, who was assigned to answer legal questions for Lanigan, to cross-examine Correia. The attorney replied that he was not appointed to cross-examine witnesses but only to answer questions for Lanigan, adding that even if Lanigan were now to accept him as trial counsel, he was not prepared to represent Lanigan at the violation hearing because he had not read any of the witnesses' statements. The trial justice rejected counsel's arguments and indicated that the case would proceed with either counsel cross-examining the witness or Lanigan cross-examining the witness.

It was at this point that Lanigan asked the trial justice to recuse himself on the basis of an alleged 1973 incident wherein Lanigan claimed the justice, then a state prosecutor, threatened to violate him if he did not vacate the Chapin Building, which housed the Methadone program. The trial justice professed no familiarity with the incident and stated that even if in fact it had happened, it did not prejudice him in any way. Thereafter, counsel from the Public Defender's office again protested his lack of preparedness, and the trial justice relented and granted a one-day continuance. The question of recusal was never raised again at the violation hearing.

---

**12.** At the June 10, 1984 hearing, Lanigan requested the trial court to order ACI officials to provide him with law books or access to a library. The trial justice denied Lanigan's request as not being properly before the court.

As we stated earlier, the trial justice's decision on a motion for continuance is discretionary in nature and, unless abused, will not be disturbed on appeal. *Gormley v. Vartian*, 121 R.I. 770, 403 A.2d 256 (1979). In light of Lanigan's persistent refusal, without reasonable explanation, to accept the Public Defender as his legal representative as well as the trial justice's granting of two prior continuances at Lanigan's request, one of which was for seven weeks, we cannot say that the trial justice abused his discretion in granting Lanigan a one-day continuance.

As for the question of recusal, we believe the claim to be without merit. In *State v. Clark*, 423 A.2d 1151, 1158 (R.I.1980), we stated that "a judge has as great an obligation not to disqualify himself when there is no occasion to do so as he has to do so when the occasion does arise" and that "recusal is not in order by a mere accusation that is totally unsupported by substantial fact." This principle was more recently reiterated in *State v. Cruz*, 517 A.2d 237 (R.I.1986). Here Lanigan made a completely unsupported accusation that placed no obligation on the trial justice to disqualify himself.

For the above-stated reasons, the petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, and the papers in the case are remanded to the Superior Court with our decision endorsed thereon.