**STATE**

v.

**Jose GARCIA.**

**No. 96–169–C.A.**

Supreme Court of Rhode Island.

Jan. 26, 2000.

**1042**

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Janice Weisfeld, Paula Rosin, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

A night of road rage and vengeful arson culminated in a family of six innocent victims, including four children, burning to death in a Providence house fire. Convicted of the grisly crimes leading to this holocaust, the defendant, Jose Garcia, challenges on appeal not only the propriety of certain evidence introduced against him at his trial, but also the sentences he received. For the reasons adduced below, we affirm the Superior Court's judgment of conviction.

## I

### Facts and Travel

On the evening of February 26, 1993, defendant and several acquaintances were traveling by automobile in opposite directions on Haywood Street in Providence. The defendant was a passenger in a car driven by one of those acquaintances, Jose Tapia (Tapia); William Cifredo (William), Tapia's cousin, was driving another vehicle. The drivers had stopped their automobiles in the road and were conversing among themselves when another vehicle suddenly backed out of a driveway at 54 Haywood Street and collided with Tapia's car. An altercation quickly ensued between Tapia and the driver of this other car, Samuel Lorenzo (Lorenzo). Meanwhile, an occupant in Lorenzo's automobile, Jorge Diep (Diep), left the car and briefly entered the house at 54 Haywood Street. Upon re-emerging, Diep jumped into the driver's seat of Lorenzo's vehicle, shoved the gear into reverse, slammed his foot on the gas pedal, and bashed the vehicle into Tapia's car. By now William was out of his driver's seat and yelling at Diep to stop. But Diep was not yet done. He proceeded to run William over with Lorenzo's vehicle, trapping him underneath the car and dragging him several hundred feet down the road until William's body finally dropped free of the chassis. Eventually, an ambulance transported the battered William to Rhode Island Hospital where he underwent hours of emergency surgery. Ultimately, he survived.

While William's family and friends awaited an update on his condition at the hospital, defendant, who had witnessed the mayhem on Haywood Street, "came screaming on the ramp, [and] told everyone * * * they [were] going to get them for what they did to Will." He also stated that "he [had previously] burned [a] crackhead's house down because he owed him $600." After delivering this exhortation, defendant, with Tapia and others, proceeded by car back to the Haywood Street area. Tapia first drove to Vernon Street to drop off one of their friends. He and defendant then went inside a house and came out shortly thereafter. Tapia requested the keys to the trunk from the driver of their car, Latissa Southerland (Southerland), and retrieved a yellow antifreeze container from the vehicle's trunk. Tapia and defendant then climbed into the back seat of the car and requested Southerland to take them to a gas station. Once there, Tapia and defendant filled the antifreeze container with gasoline and reentered the car. Too anxious to drive any further, Southerland requested Tapia to

take over the wheel. He did so and at about midnight they all drove to an apartment complex located two streets behind the house at 54 Haywood Street from which Diep had emerged to wreak havoc on William and his car. Carrying the yellow container, defendant left the car with Tapia while the others remained there and waited for them. When defendant and Tapia returned some ten minutes later, defendant was no longer carrying the yellow container. As defendant and the others drove away from the scene, they could see smoke rising from the direction of Haywood Street. When one of the vehicle's occupants asked defendant what had happened, he responded that he and Tapia had "poured the gas from the top to the bottom."

As fate would have it, however, neither Lorenzo nor Diep, the intended targets of defendant's revenge, lived at 54 Haywood Street, nor were they otherwise present there when defendant and Tapia returned to the premises. But Carlos Chang, Hilda DeRosario, and their four children did live there. And they were all present in their apartment on the third floor when defendant and his accomplice doused the stairwells with gasoline and set the building ablaze. Despite a desperate attempt by Carlos Chang's brother-in-law, Ivan Ponce, to rescue them, the entire Chang family perished in the gasoline-induced inferno.

The next day, after hearing that the police were questioning some of the individuals who had been with him the previous evening, defendant boarded a van bound for New York. Nine days later, New York City police arrested him at his mother-in-law's Bronx apartment, at which point defendant unsuccessfully attempted to flee through a window. Ultimately, a jury convicted defendant of arson, conspiracy to commit arson, and the felony murder of the Chang family's six members.

He was sentenced to two concurrent terms of life without parole, plus a term of ten years to serve, to be followed by four consecutive life sentences. Challenging the evidence that was introduced at his trial and the sentences he received, defendant appeals from these convictions.

## II

### Analysis

#### A. *Coerced Testimony*

██ The defendant first claims that the police statements and trial testimony given by two of the witnesses against him were coerced and should have been suppressed. Because this evidence was introduced against him at trial, he contends that his federal constitutional right to due process of law was violated.[1] Because the totality of the circumstances pertaining to the gathering and the presentation of this evidence does not support his contention, we reject this argument.

██ At the outset, we note that persons who are mere witnesses to criminal acts do not enjoy the same federal due process protections when they are being questioned by the investigating authorities as do suspected wrongdoers who are being interrogated while they are in police custody. For example, *Miranda* warnings[2] need be given only to suspects in police custody, but not to potential witnesses who are subjected to investigative police questioning. *See State v. Diaz*, 654 A.2d 1195, 1204–05 (R.I.1995). *See also United States v. Mandujano*, 425 U.S. 564, 579, 96 S.Ct. 1768, 1777–78, 48 L.Ed.2d 212, 220 (1976) (*Miranda* warnings are aimed at "the evils seen by the court as endemic to police interrogation of a person in custody"). Most importantly, even when a witness has been coerced into providing the police with a pretrial statement that impli-

---

1. The defendant makes no claim that any of his rights under state law were violated. Accordingly, we have no occasion to pass on the propriety of the alleged misconduct under Rhode Island law.

2. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

cates the accused, the mere fact that a witness has given the police such a statement during the investigation of a crime does not necessarily prevent the witness from testifying voluntarily at trial in a manner consistent with the pretrial statement. As we said in *State v. Damiano*, 587 A.2d 396, 399 (R.I.1991): "We know of no precedent from the Supreme Court of the United States that would require a jury to ignore the testimony of a live witness on the basis of having a reasonable doubt concerning whether a prior statement containing the substance of such testimony had been produced by coercion." Nevertheless, this is exactly what defendant is suggesting should be the law when he argues in this appeal that the trial testimony of two witnesses should have been precluded on the basis of alleged pretrial coercion by the police in obtaining statements from them.

The defendant insinuates that one of the witnesses against him, Southerland, was a callow nineteen-year-old who had no previous experience in dealing with the police. He claims that the police arrested her two days after the fire without probable cause to do so and then held her at the police station for several hours, where, he says, they screamed at her, accused her of lying, threatened her with murder charges and with the loss of her child, and denied her request to call an attorney. He claims that these circumstances render involuntary any subsequent statements she gave to the police. Ultimately, he claims the trial justice should have suppressed not only these statements but also her trial testimony to avoid violating his due process right not to be convicted based upon coerced evidence.

■ The facts and the applicable law, however (*see, e.g., Damiano, supra*), support the contrary conclusion drawn by the trial justice. We will reverse a trial justice's findings on a motion to suppress only if (1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied. *See State v. Humphrey*, 715 A.2d 1265, 1273 (R.I.1998). In this case, the police arrested Southerland on February 28, 1993, two days after the February 26 incidents that gave rise to the criminal charges against defendant. On that date, she gave the police a statement which she later described as "a half truth," but she did not incriminate defendant. The police then released her, only to bring her back to the station on the next day for additional questioning. Nevertheless, she refused to give them any further statements on that day. The police then released her again and told her to come back with an attorney. Thus, whatever the police may have said and done to Southerland on February 28, it did not cause her on that day (or the next) to implicate defendant in the crimes for which he was ultimately convicted.

The following day she did return to the police station with her lawyer, but still she gave no statement to the police at that time. Instead, the police and Southerland's attorney merely discussed the prospect of Southerland's giving the police another and more forthcoming statement about the fire. Not until March 5 did Southerland, accompanied by her attorney, proceed to the Attorney General's office and provide a more lengthy written statement fully inculpating defendant. The trial justice found that she had done so without any governmental authority having leveled any threats against her. The trial justice also concluded that Southerland had not been forced to return to the police station on each of the prior occasions. Rather, as Southerland herself stated, "I went voluntarily," albeit "I just didn't want to go back down there." Indeed, at that point, according to Southerland, "I wasn't cooperating." Only during her meeting with law enforcement personnel on March 5 in the presence of her counsel did Southerland give her second and only statement that incriminated defendant. The defen-

dant presented no evidence to suggest that there was any police coercion in connection with this fourth and final meeting between Southerland and the authorities.

During another portion of Southerland's trial testimony, she indicated that "while all these lawyers and police officers" were waiting for her at the Attorney General's office on March 1, she remained in a room with her attorney, who "told [her] it was up to me." Finally, she admitted, "I decided to cooperate with them." It was only at that point that she even discussed the possibility of giving the police a second statement that would incriminate defendant. Four days later on March 5, without any showing by defendant of any coercion in the interim by any law enforcement personnel, and in the presence of her attorney, Southerland provided her second statement to the authorities. Based on these circumstances, we are unable to fault the trial justice's conclusion that Southerland's March 5 statements to the police (as well as her consistent trial testimony) were not the product of police coercion.

Likewise, the trial testimony and pre-trial statements of the other witness in question, Nesha Perry (Perry), also appear to us, as they did to the trial justice, to have been voluntary. With regard to her pretrial statements, the only threatening tactics by police occurred before Perry's first and false statement in which she claimed that she knew nothing about the fire; Perry's second statement incriminating defendant was not the result of police threats. Before she provided the police with her first and false statement, she claimed that a police detective threatened to "put his foot in [her] * * * behind." It was also before this first statement that police showed her pictures of the bodies charred by the fire. Notwithstanding these allegedly coercive police tactics, Per-

ry maintained in her first statement that she knew nothing about the fire. Thus, the trial justice was correct in concluding that Perry did not inculpate defendant solely as a result of police coercion and threats.

To be sure, after giving her first statement wherein she claimed to have no knowledge about the fire, Perry testified that the police told her that they did not believe her, that she could be in trouble for withholding truthful information from them, and that she would not be allowed to leave until she provided them with the truthful information they were asking to obtain from her. But Perry also testified that the police made no intimidating statements to her, nor did they engage in an otherwise coercive course of conduct towards her after she gave them her second and truthful statement and before she testified at both defendant's bail hearing and before the grand jury. The trial justice found that the police did not tell Perry what to say, and we are unable to conclude that this historical finding is clearly erroneous. We acknowledge that some of the evidence indicated that a detective had insisted to Perry that he knew she was lying after she initially denied any knowledge about the fire, that Perry would be in trouble for making such a statement, and that she would have to remain at the police station until she told the police what she knew about the fire. But in light of the fact that Perry later testified that she then voluntarily relayed the truth to the police in her second statement, we are not persuaded that these acts were so coercive as to cause Perry to provide her second and truthful statement to the police against her will, much less that her later sworn testimony at the bail hearing and before the grand jury were the product of unlawful police coercion.[3]

**3.** The defendant's reliance on *LaFrance v. Bohlinger,* 499 F.2d 29 (1st Cir.1974) in this regard is misplaced. *LaFrance* merely held that a trial judge who fails to hold a voluntariness hearing out of the presence of the jury

when a factual issue exists concerning the voluntariness of a witness's impeaching statement violates the defendant's rights. *Id.* at 34. *Vargas v. Brown,* 512 F.Supp. 271 (D.R.I. 1981), also cited by defendant, stands for the

██ We also conclude that the mere fact that both these witnesses entered into agreements with the authorities for non-prosecution and/or for plea bargains of one sort or another does not render their testimony coerced. As the First Circuit observed in the case of *United States v. Dailey,* 759 F.2d 192 (1st Cir.1985):

> "Long ago the courts rejected the notion that the testimony of co-defendants and other interested witnesses was so likely to be unreliable that it should be excluded. * * * Recognizing that such individuals were frequently the most knowledgeable witnesses available, the courts have chosen to allow them to testify and to rely upon cross-examination to ferret out any false testimony they might give." *Id.* at 196.

Thus, the "mere fact that a witness hopes to receive a reduced sentence or some other form of leniency does not disqualify him [or her] as a witness but affects only the weight of his [or her] testimony." *Id.* at 198 (quoting *United States v. Insana,* 423 F.2d 1165, 1168 (2d Cir.1970)). Likewise, the mere fact that some of the witnesses against defendant entered into quid pro quo agreements with the prosecution granting them immunity or other favorable treatment in connection with their agreement to cooperate does not destroy the voluntariness of their truthful statements to the police nor their later trial testimony that was consistent with such statements.

## B. *Admissibility of Jose Cifredo's Bail Hearing Testimony and His Purported Recantation*

On February 27, 1993, the police arrested Jose Cifredo (Cifredo), William's brother, who was also with defendant on the evening of February 26 and who later signed a written statement inculpating defendant in setting the fire. However, after invoking his constitutional right not to incriminate himself, Cifredo refused to testify at trial. Moreover, he claimed during a voir dire hearing at the trial that his earlier statement to the police and his bail hearing testimony—both of which implicated defendant—were false. Nevertheless, the trial justice permitted the prosecution to read Cifredo's bail hearing testimony to the jury during the trial. When a witness is unavailable to testify at trial, "[r]ecorded testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, [is admissible] if the party against whom the testimony is now offered, * * * had an opportunity to develop the testimony by direct, cross, or redirect examination." R.I. R. Evid. 804(b)(1). Here, Cifredo's bail hearing testimony was shown to have been competent and admissible and to have been adduced in the course of a prior judicial proceeding at which defendant was present, was represented by counsel, and was able to cross-examine Cifredo. *See State v. Ouimette,* 110 R.I. 747, 753, 298 A.2d 124, 129 (1972).

██ Compelling Cifredo to testify at trial would have required him to concede under oath that he had lied in his earlier police statement and in his sworn bail-hearing testimony. Such admissions would have subjected him to criminal prosecution for filing a false police statement and for perjury because he had no immunity from such charges. Thus, the trial justice did not err in precluding defendant from questioning Cifredo about such matters during the trial. Finally, Cifredo testified that the police did not threaten him and that his father and his attorney were present when he provided the police with his original statement. Nor was he threatened in any way before giving his bail hearing testimony. Hence, we are unable to conclude that the trial justice erred in admitting his prior recorded testimony.

██ We are also convinced that the trial justice did not err in denying defen-

same proposition. In this case, the trial justice did hold such a hearing outside the jury's

presence, so we have no need to rule on whether the court was required to do so.

dant's motion to admit Cifredo's subsequent sworn testimony at a pretrial hearing during which he attempted to recant at least a portion of his earlier bail hearing testimony.[4] During a voir dire hearing in the middle of defendant's trial, Cifredo stated, "I just don't want the testimony that I made [at the bail hearing] to count against anything," thereby leading the trial justice to conclude that "[i]t was obvious to this Court in observing this witness, he just did not want to testify, and more particularly, he did not want to testify against his cousin, Mr. Tapia, who was still involved in the case at that time." It is precisely for this latter reason that courts look with particular disfavor and suspicion on purported recantations by relatives of a defendant. *See, e.g., United States v. Provost,* 969 F.2d 617, 621 (8th Cir.1992) ("[r]ecantation is particularly common when family members are involved and the [witness] has feelings of guilt or the family members seek to influence the [witness] to change [his] story"). In this case, Cifredo's cousin, Tapia, was a codefendant. Moreover, here, as in *State v. Doctor,* the trial justice found that the disavowing witness was not credible, that the witness had given contradictory statements on prior occasions, and that his attempted recantation of his earlier sworn testimony was "for reasons other than desiring to correct any inaccuracy in his prior testimony." 690 A.2d 321, 329–30 (R.I.1997). Thus, the trial justice stated that he did not "believe a word [Cifredo] said" in connection with his recantation. Cifredo's claim that some or all of his bail hearing testimony was

false also contradicted his previous statement to the police. Thus, evidence existed that Cifredo wanted to recant his bail hearing testimony for reasons other than a mere desire to correct any inaccuracy. This is why "[a] statement tending to expose the declarant [Cifredo] to criminal liability and offered to exculpate the accused [defendant] is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." R.I. R. Evid. 804(b)(3). Here, on the contrary, substantial, additional, and corroborative evidence exists in the record to support the accuracy of Cifredo's bail hearing testimony and, consequently, the falsity of his purported recantation.

In sum, defendant adduced virtually no evidence to support his claim that Cifredo's bail hearing testimony had been coerced, and we are not persuaded that the trial justice erred in preventing defendant from introducing into evidence Cifredo's spurious attempt to recant his earlier testimony during the trial's voir dire hearing.

## C. *Defendant's Reference to A Prior Uncharged Act of Arson*

 Southerland testified that while she and her other friends were at the hospital awaiting an update on William's condition, she heard defendant on the hospital ramp screaming that "they were going to get them for what they did to Will," and that defendant said that he had previously "burned [a] crackhead's house down because he owed him $600." [5] The defen-

---

4. Cifredo, however, was unable or unwilling to specify which aspects of his prior testimony were supposedly false. Thus, his attempted recantation did not indicate which answers that he gave were false, nor did he specify in what respect they were false. Such a purported disavowal of his earlier sworn testimony failed to clear the threshold hurdle for admitting such evidence as a genuine recantation: that is, showing that the recantation contains "specific and clear" admissions as to "which * * * answers in prior testimony were false and in what respects they were false."

*United States v. Goguen,* 723 F.2d 1012, 1018 (1st Cir.1983).

5. Evidence of defendant's statement regarding his prior act of arson also appears in the transcript of Cifredo's bail-hearing testimony, which was admitted at trial as State's Exhibit No. 16. However, defendant did not object to the admission of this testimony on R.I. R. Evid. 404(b) grounds, nor did he request a limiting instruction concerning such evidence. Thus, even if defendant had not withdrawn his objection to Southerland's testimony on this same subject, *infra,* his failure to

dant contends that the trial justice should have excluded this testimony as "evidence of other crimes, wrongs, or acts" because it was offered to prove his character in order to show that he acted in conformity therewith in violation of Rule 404(b) of the Rhode Island Rules of Evidence.[6]

First, we note that although defendant's counsel initially objected to the admission of this testimony and moved to strike it, ultimately he decided to withdraw his objection after the trial justice and the prosecutor elicited evidence from Southerland that defendant's reference to a prior house burning "didn't have anything to do with the fire" in this case:

"Q At this point when [defendant] talked about burning this house down, what had Jose Tapia done with Tamara?

"A He told her to go in the hospital to get Nesha so she could bring her home.

"THE COURT: I think we better clarify what you mean by 'burning this house down.'

"MR. LEVIN: I'm sorry.

"Q The house ——.

"THE COURT: In another jurisdiction.

"Q In another jurisdiction, the crackhead's house.

"THE COURT: It has nothing to do with the house allegedly in this case.

"Q Is that correct?

"A No, it didn't have anything to do with the fire.

"Q At that time?

"A Yes.

"THE COURT: And you [referring to defendant's attorney] object to that? Overruled. Overruled.

"MR. O'BRIEN: *I withdraw my objection.*

\* \* \*

"Q When [defendant] said that he had burned down a crackhead's house for $600 did Jose Tapia say anything?" (Emphasis added.)

Because defendant's objection to the admission of his prior-house-burning statement was withdrawn and because this evidence also was introduced without a Rule 404(b) objection through Cifredo's bail-hearing testimony, the trial justice's admission of this evidence cannot now form the basis for a claim of error under Rule 404(b).[7] Nonetheless, despite having

object to this evidence coming in through Cifredo's bail-hearing testimony or to request any limiting instruction regarding same was fatal to any preservation of this issue on appeal because "a party loses the benefit of his original exception if he thereafter permits similar testimony on the same subject to be introduced into evidence without objection." *State v. Gordon*, 508 A.2d 1339, 1347 n. 7 (R.I.1986) (citing *State v. Dettore*, 104 R.I. 535, 540, 247 A.2d 87, 90 (1968)).

6. Rule 404(b) provides as follows:

"*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

7. Notwithstanding the fact that defendant's original objection to the admission of his prior house-burning statement was both withdrawn (in the case of Southerland's testimony) and not asserted at all (with respect to Cifredo's testimony), the dissent maintains that the admission of this evidence was "in direct violation of Rule 404(b) of the Rules of Evidence." With all due respect to our dissenting colleague, we will not permit a party who withdraws an evidentiary objection at trial because he or she perceives it as tactically advantageous to do so (and who fails to object at all when such evidence is introduced through another witness) to claim later on appeal that the very testimony which was the subject of the withdrawn objection was improperly admitted into evidence. Having made his evidentiary bed at trial, defendant cannot complain when he is required to sleep in it on appeal. This same reasoning also applies to defendant's failure to object or to move to strike Cifredo's bail-hearing testimony on this subject. "Our long-standing rule is that a contemporaneous objection or at least

withdrawn his objection to the court's admission of this evidence, defendant later requested the trial justice to give the jury a cautionary instruction about its use of this prior-arson evidence. The trial justice did so, actually reading the text of Rule 404(b) to the jurors and cautioning them that "it's not used to show that defendant committed *this particular crime.* He's presumed innocent * * * evidence of any other unlawful activity is not used to show that someone has the capacity to commit a crime." (Emphasis added.) The defendant did not object to this instruction, nor did he request that it be modified or supplemented. Thus, any objection to its adequacy has not been preserved for appellate review.[8] However, when the prosecutor again adverted to defendant's prior-arson statement in his summation—arguing that defendant had acted in conformity with his admitted prior act of arson ("what [defendant] was doing [in this case] was acting in conformity about [*sic*] what he had done")—defendant's counsel again objected and requested a cautionary instruction. Ultimately, the trial justice declined to repeat his prior instruction on this point, except to tell the jury that what the attorneys say in their arguments "are never law or never fact."

■■■■■ In any event, even if defendant had not withdrawn his objection to this

a motion to strike * * * are prerequisites to an appellate review." *State v. Dettore,* 104 R.I. 535, 540, 247 A.2d 87, 91 (1968); *see also State v. Martinez,* 651 A.2d 1189, 1194 (R.I. 1994) (Weisberger, C.J.) ("defendant did not object to [the witness'] testimony on the ground of a violation of Rule 404(b), thus * * * defendant has waived the right to raise that issue on appeal"). And the trial justice cannot be charged on appeal with failing to give a Rule 404(b) instruction regarding Cifredo's bail-hearing testimony because "the trial justice was under no obligation to give a limiting or cautionary instruction in the absence of a request to be made by counsel for the defense," *id.* at 1195, because "[t]he present case does not deal with sexual assault." *Id.* (citing *State v. Jalette,* 119 R.I. 614, 621–28, 382 A.2d 526, 533–34 (1978)).

8. The dissent, nonetheless, claims that "[c]ertainly the issue of the adequacy of the instruction has been preserved." Not surprisingly, the dissent cites to nothing in the record that could support·this proposition because the instruction was given without any objection whatsoever from the defendant. Thus, the dissent's contention that the adequacy of this instruction "has been preserved" is untenable. The dissent also finds fault with the trial justice's instruction concerning defendant's prior-arson statement, characterizing it as "scatter-shot" and "a mere collocation of words," a criticism that it also levels at our explication of the various legitimate purposes for the trial justice admitting this prior-arson evidence in the first place. Notably, defendant raised no such objections when the instruction was given. Moreover, the dissent's brickbats on this score might as well be hurled at the text of Rule 404(b) itself because

it too allows the proponent of prior-bad-acts evidence to offer it for a broad range of relevant purposes while barring its use for only one impermissible purpose. The dissent, however, grouses that this Court just "gives lip service to the obligation of the trial justice to explain the limited purpose for which the jury may consider such evidence, but apparently [is] unable to select an appropriate purpose even at the appellate level." As we show below, however, the trial justice had no such instruction obligation absent a specific request from the defendant asking the trial justice to instruct the jury that it could only consider such evidence for certain specific and limited purposes, but it could not use such evidence for propensity or bad character purposes. No such specific request was ever presented. Moreover, the appropriate purposes for allowing such evidence to be introduced during this trial were manifold. Thus, there was no requirement then or now for the trial court, the prosecution, or this Court "to select *an* appropriate purpose" (emphasis added)—at least when the evidence, as here, was admissible for each of *several* discrete purposes. Put differently, Rule 404(b) does not require the proponent to offer prior-bad-acts evidence just for one appropriate purpose when in fact such evidence is admissible for several appropriate purposes. Most significantly, defendant never objected to the prosecution's failure to specify a particular purpose when it introduced this evidence, nor did defendant request the trial justice to ascertain the purposes for which this evidence was offered and then instruct the jury that it could only use this evidence for such purposes. Having failed to do so, defendant has waived appellate review concerning the propriety of the trial justice's handling of this evidence when it was ruled admissible.

prior-arson evidence, and thereby waived his right to later claim that its admission constituted reversible error and even if defendant had objected to the introduction of Cifredo's bail-hearing testimony on this issue instead of making no objection at all based upon Rule 404(b), we hold that this evidence was properly admitted. First, it was not introduced to prove defendant's bad character to show that he acted in conformity therewith. Rather, it was admissible under several of the various exceptions to the general exclusionary rule of Rule 404(b) that prohibits the use of prior-bad-acts evidence to prove conduct in conformity with character. "[U]nder Rule 404(b) evidence of prior criminal acts are [*sic*] inadmissible only if that evidence is both prejudicial and irrelevant." *State v. Martinez,* 651 A.2d 1189, 1194 (R.I.1994) (Weisberger, C.J.). Thus, the mere fact that this evidence was prejudicial to defendant did not require its exclusion. Here, for the reasons set forth below, defendant's prior-arson statement was clearly relevant to whether defendant was guilty of committing the charged act of arson. In any event, "questions of relevancy of evidence, including whether the probative value of proffered testimony is outweighed by the danger of undue prejudice, are left to the sound discretion of the trial justice. The trial court's determination will not be disturbed on appeal absent a showing of prejudicial abuse of that discretion." *State v. Gordon,* 508 A.2d 1339, 1347 (R.I.1986). And even though the trial justice's refusal to reinstruct the jury on Rule 404(b) in response to the prosecutor's improper closing argument that defendant "was acting in conformity about [*sic*] what he had done" constituted error, it was harmless error in light of (a) the trial justice's previous instruction to the jury on the proper and improper uses of such evidence, (b) defendant's earlier withdrawal of his objection to the admission of this evidence through Southerland's testimony and his non-objection to its admission through Cifredo's bail-hearing testimony, and (c) the overwhelming other evidence of defen-

dant's guilt. As a result, we reject defendant's contentions on appeal that this evidence should not have been admitted at all and that the trial justice's failure to sustain the defendant's objection to the prosecutor's acting in conformity with closing argument and to reinstruct the jury on what use it could make of defendant's prior-arson statement constituted reversible error.

First, the evidence concerning defendant's prior-arson statement was not offered to prove defendant's bad character to show he had acted in conformity therewith on this occasion. Rather, Southerland's and Cifredo's recollections of defendant's prior-arson reference were relevant and admissible in proving at least three separate aspects of the crime charged: (1) defendant's motive to seek revenge for William's injuries (he was telling William's friends and family that when some "crackhead" had crossed him previously, he had retaliated for that perceived wrong by burning this person's house down; thus, defendant was indicating to his compatriots that he was motivated to retaliate for William's injuries in the same manner in which he claimed to have responded when some "crackhead" had failed to pay him what was owed); (2) his settled purpose to achieve that revenge by committing the charged act of arson; and (3) his malicious intent to burn down 54 Haywood Street that very night. Thus, it was *defendant's* utterance *itself*—and not whether he in fact committed such a prior arson or was just boasting about having done so—that was relevant in proving defendant's motive, his settled purpose, and his intent to commit the charged act of arson.

Second, the prosecution was entitled to elicit Southerland's and Cifredo's testimony about *defendant's prior-arson* statement because of its undeniable relevance to proving how the events leading up to the defendant's commission of the charged crimes unfolded on the night in question. *See* Advisory Committee's Note, R.I. R. Evid. 404 (stating that "[e]vidence of other

crimes or acts by the accused may also be admitted to explain other evidence or for background purposes") (citing *State v. Gordon*, 508 A.2d 1339 (R.I.1986)). Significantly, it was not offered as part of a gratuitous or freestanding attack on defendant's character. Indeed, when the trial justice and Southerland emphasized several times before the jury that the alleged prior arson had no connection to the crime charged, defendant's attorney withdrew his objection to the admission of this evidence. Moreover, when the prosecutor next asked Southerland whether Tapia, the codefendant, had responded to defendant's prior-arson reference, the state was using this prior-arson testimony to show how a conspiracy to commit this crime arose between defendant and Tapia. Thus, in the context of what happened that evening, defendant's prior-arson boast served as a catalyst to mobilize William's friends and family into taking action to avenge his mistreatment. In other words, defendant's prior-arson assertion to his accomplices was an important part of the factual background concerning how and why this crime came to be committed.

▪ Nevertheless, we recognize that defendant's prior-arson statement, in addition to its relevance in proving several essential aspects of the crime for which he was accused, was also relevant to show that defendant's character was less than sterling and that he had acted in conformity with his prior act of arson on the night in question. But the mere fact that the jury is capable of using prior-bad-act evidence for such purposes does not mandate its exclusion under Rule 404(b) because that rule does not "require exclusion of otherwise legally probative evidence simply because such evidence might also suggest past criminal activity." *See Gordon*, 508 A.2d at 1348 (holding that "[t]he prohibition against use of evidence of a defendant's prior criminal conduct to infer bad character and action in conformity therewith on the occasion in question does not mandate exclusion of all evidence, regardless of how otherwise legally probative, containing any reference to past criminal conduct").

In *Gordon*, we upheld as relevant background information the admission into evidence of testimony concerning the prior theft of a medical information card found in a car connecting the accused to the crime of arson. We also upheld the admission into evidence of a note written by the accused to his girlfriend shortly after the discovery of the crime which read, "If we can do without it in jail, we can do without it on the street." *Id.* at 1347. Notwithstanding the accused's reference to "jail"— suggesting he had been incarcerated for one or more prior crimes—we reasoned that the note was admissible because it suggested flight to avoid prosecution and thereby was relevant to demonstrate the defendant's consciousness of his guilt. *Id.* at 1347–48. Thus, we upheld the note's admission into evidence despite its undeniable suggestion of defendant's prior criminal activity and resulting incarceration. *See id.* And in *State v. Sepe*, 122 R.I. 560, 410 A.2d 127 (1980), we quoted Wigmore's treatise on evidence to the effect that "evidence of criminal conduct tending to show that a defendant had formed a settled purpose * * * is admissible, and * * * the criminality of such prior acts does not affect their admissibility." *Id.* at 566, 410 A.2d at 130 (quoting 2 Wigmore, *Evidence* §§ 304, 305 (3d ed.1940)). Rather, "they are received in spite of their criminality." *Id.* (quoting 2 Wigmore, § 305 at 205).

▪ Thus, the mere fact that defendant's prior-arson reference obviously suggested that he was guilty of past criminal activity did not mean that such a statement was necessarily inadmissible. Instead, it called for an analysis of whether it could nonetheless be admitted under one or more of the exceptions to Rule 404(b)'s general prohibition on admitting evidence of prior bad acts to prove character and acts in conformity therewith. *See State v. Gallagher*, 654 A.2d 1206, 1209 (R.I.1995). For example, evidence of prior bad acts is

admissible to prove guilt of the crime charged, *see State v. Parkhurst,* 706 A.2d 412, 424 (R.I.1998) (citing *State v. Stewart,* 663 A.2d 912, 923 (R.I.1995)), if such evidence has "independent relevance in respect to the proof of an element material to 'the chain of proof of the crime in issue.'" *See State v. Acquisto,* 463 A.2d 122, 128 (R.I.1983) (quoting *State v. Colangelo,* 55 R.I. 170, 174, 179 A. 147, 149 (1935)). Furthermore, evidence of prior bad acts is admissible to prove "'guilty knowledge, intent, motive, design, plan, scheme, system, or the like * * *.'" *See State v. Lemon,* 497 A.2d 713, 720 (R.I. 1985). In this case, defendant's claim to have burned down a crackhead's house in the past as he urged his cohorts to retaliate for William's injuries revealed both his vengeful motive and his "settled purpose," *Sepe,* 122 R.I. at 566, 410 A.2d at 130, to commit the charged misconduct, as well as his preferred plan and intention to achieve his revenge via arson, and thus falls squarely within these exceptions to Rule 404(b). Certainly, it was a part of defendant's conduct on the night in question that was "inconsistent with the defendant's claim of innocence" and that "constitute[d] circumstances bearing on the question of guilt." *Acquisto,* 463 A.2d at 129 (notwithstanding fact that defendant's threat to a witness may well have constituted a discrete crime, its independent relevance to proving defendant's consciousness of guilt

for the charged crime caused it to be admissible in evidence).

This Court has noted previously that the line dividing prior-bad-act evidence offered to show a propensity to commit such acts and/or a defendant's bad character, and prior-bad-act evidence offered to show motive, intent, or for some other permissible purpose is both a fine one to draw and an even more difficult one for judges and juries to follow. *See State v. Hopkins,* 698 A.2d 183, 191 (R.I.1997).[9] In cases like the one at bar, in which the evidence in question can be used for multiple purposes, some of which are permissible and others of which are not, the trial justice should issue specific instructions to the jury explaining "the limited purpose [or purposes] for which the jury may consider it." See Gallagher, 654 A.2d at 1210. However, we reiterate that it is only in sexual assault cases that a trial justice is *required* to issue a cautionary instruction to the jury regarding the limited use of Rule 404(b) evidence even in the absence of a specific request by defense counsel to do so. *See Martinez,* 651 A.2d at 1195. Because "[t]he present case does not deal with sexual assault * * * therefore, the trial justice was under no obligation to give a limiting or cautionary instruction in the absence of a request to be made by counsel for the defense." *Id.*[10]

9. In *State v. Hopkins,* 698 A.2d 183 (R.I. 1997), we observed that "judges (let alone jurors) have great difficulty in limiting the use of 404(b) evidence to the noncharacter purposes for which it has been admitted. But this difficulty is inherent in the fine (some would say illusory) distinctions drawn by Rule 404(b) between evidence introduced to show conduct in conformity with character and evidence introduced for 'other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,' and the like." *Hopkins,* 698 A.2d at 188 n. 5. Nonetheless, "as long as the trial justice properly instructed the jury on the limited purpose or purposes for which such evidence may be considered, it is generally admissible. for such limited purposes, notwithstanding its undeniable relevance to proving that defendant acted in conformity with his prior bad acts." *Id.*

10. For this reason, the dissent's reliance on Justice Kelleher's remarks in *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978), concerning the method of instruction to be given the jury in sexual assault cases and how Rule 404(b) evidence should be used only when it is reasonably necessary for the prosecution to carry its burden of proof in such cases is misplaced. "In respect to non-sexual crimes, only independent relevance must be shown and the reasonable-necessity requirement is not a condition precedent to the introduction of such evidence." *State v. Acquisto,* 463 A.2d 122, 129 n. 3 (R.I.1983) (Weisberger, J.). Because the case at bar is not a sexual assault case, the trial justice's jury instruction obligations regarding defendant's prior bad acts depended on defendant offering specific limiting instruction requests for the trial justice to give to the jury and on defendant making

Nevertheless, we take this opportunity to emphasize that whenever evidence of prior bad acts is admitted under one or more of the exceptions to Rule 404(b), the better practice is for the trial justice to give an appropriate limiting instruction to the jury before or as soon after such evidence is admitted as the circumstances permit, without waiting for one of the parties either to request such an instruction or to object to the trial justice's failure to do so. Such an instruction should advise the jury concerning both the permissible and impermissible uses of such evidence. In the case at bar, the trial justice gave the jury a limiting instruction with regard to its use of defendant's statement, but only after the witness had answered several succeeding questions and only after defendant's counsel in front of the jury had withdrawn his objection to this evidence. An instruction immediately preceding or following the introduction of any such evidence, rather than at some later point in the proceedings, will be more likely to prevent jury speculation about defendant's bad character and propensity to commit such acts than one that is delivered at some later point in the proceedings after the jury has already been given the opportunity to draw conclusions about defendant's bad character or his or her propensity to commit this type of bad conduct. Nonetheless, the general rule remains that "although the trial justice has a responsibility to issue a limiting instruction in certain instances, there is no requirement that this instruction be given immediately after the testimony has been given." *State v. Cardoza,* 649 A.2d 745, 748 (R.I.1994). And any defendant who objects to the content or timing of the trial justice's instructions to the jury about its use of Rule 404(b) evidence or to the trial justice's alleged failure to instruct the jury adequately concerning the limited purposes for which it may use such evidence—if the objections are to be preserved for appellate review—must do so specifically and must place those objections on the record in a manner that alerts the trial justice to the alleged inadequacy of the instruction, thereby giving him or her an opportunity to correct the same. *See, e.g., State v. Cianci,* 430 A.2d 756, 765 (R.I.1981) (counsel must direct the court to that portion of the charge .or omission therefrom that counsel finds objectionable and to state the grounds for the objection if alleged errors in the charge are to be preserved for appellate review).

We reject the notion, moreover, that relying on jury instructions in connection with the admission of prior-bad-acts evidence will virtually erase Rule 404(b) from the Rhode Island Rules of Evidence. *See Delli Paoli v. United States,* 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278, 285 (1957) ("[u]nless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense").[11] On the contrary, if jury instructions are not used to implement the fine

specific objections to whatever portion of those instructions he disagreed with, both of which were absent here. *See Martinez,* 651 A.2d at 1195.

**11.** The Seventh Circuit case of *United States v. Wright,* 901 F.2d 68 (7th Cir.1990), relied upon by the dissent, is distinguishable from the case at bar. In *Wright,* the defendant was on trial for distributing cocaine. The trial judge ruled that a tape recording in which the defendant claimed to be a drug dealer was admissible for the limited purposes of showing intent and identity. *See id.* at 69. The Seventh Circuit, however, held that the recording had no relevance to the crime charged except to "depict [the defendant] as a drug dealer" because it did not "illuminate the particular conduct of which the defendant is accused." *Id.* at 70. On the other hand, the Seventh Circuit impliedly acknowledged that evidence which does cast light on the particular conduct of which the defendant is accused could be admitted under one of the exceptions to Rule 404(b). The erasure of Rule 404(b) would be imminent, Judge Posner warned, if evidence of prior crimes were to be admitted based solely on their similarity to the crime charged. See Wright, 901 F.2d at 70.

distinctions governing the appropriate use of Rule 404(b) evidence, then either one of two pernicious results will follow: evidence of prior bad acts will be excluded altogether from trials (a result that alters the text of Rule 404(b) by judicially eliminating the various legitimate purposes for which prior bad acts·can be offered and admitted in evidence), or judges and juries ·will be allowed carte blanche to use prior-bad-acts evidence to convict defendants of the charged criminal acts because of their bad character or because they acted in presumptive conformity with their prior bad acts. A trial justice's instructions with regard to a defendant's prior bad acts must serve as the strong and clearly marked guardrails that ˙prevent jurors from falling into such an evidentiary abyss and that keep them on the straight and narrow path to a just and true verdict based on the law and the evidence presented.

■■■ Here, after Southerland first testified about defendant's prior-arson statement (albeit not immediately thereafter), the trial justice did read to the jury the text of Rule 404(b) and he also told them:

"Now there's been some evidence of a statement by one of the defendants about an alleged crime. * * * [E]vidence of other crimes, wrongs or acts are [sic] not admissible to prove the character of the person in order to show that he acted in conformity therewith * * * [s]o, it's not used to show the defendant committed this particular crime. He's presumed innocent. [E]vidence of any other unlawful activity is not used to show that someone has the capacity to commit a crime."

Having withdrawn his objection to the admission of his prior-arson reference, defendant did not object to this instruction or request any supplementation or alteration to its wording. As a result, this instruction became the law of the case. *See, e.g., State v. Giordano*, 413 A.2d 93, 94 (R.I. 1980). Hence we must not only presume that the jury followed this instruction, but

also we will not allow defendant to complain about the adequacy of this charge on appeal when he failed to do so at the trial. *See, e.g., Cardoza*, 649 A.2d at 748 (holding that when defendant argued on appeal that the trial justice should have given the jury a sua sponte limiting instruction regarding alleged Rule 404(b) evidence, defendant's failure to object at trial constituted a waiver of that issue).

However, notwithstanding this instruction, the prosecutor still told the jury in his closing argument that "[w]hat [defendant] was doing was acting in conformity about [*sic* ] what he had done. * * * [I]f someone is willing to burn for $600 someone is more than willing to burn for an accident where a car gets damaged and someone is run over * * *." Rule 404(b) clearly forbids such an open invitation for a jury to assess a defendant's character and guilt for charged misconduct based upon his or her prior bad acts. In response to the defendant's objection to this improper argument, the trial justice should have immediately instructed the jury to disregard this contention and reiterated his prior instruction to them about the proper and improper uses of defendant's prior-arson statement in light of Rule 404(b). Although the trial justice failed to do so, we believe, for the reasons limned below, that this error was harmless in the context of this case.

First, overwhelming and independent evidence of defendant's guilt exists in the record to support the verdict without regard to the prior-arson statement. In addition to the damning eyewitness testimony of Southerland and Cifredo, Latawn Wigginton, a witness who had no agreement with the state and who defendant never claimed had been coerced into incriminating him, testified that defendant admitted to her that he had poured the gasoline used to set the fire. Specifically, she answered defense counsel's question in the affirmative when asked whether defendant had told her, "I poured the gas. I lit the match. I don't care." Her testi-

mony also corroborated Southerland's and Cifredo's testimony to the same effect. Accordingly, the record reveals that the prosecution introduced substantial and overwhelming evidence of defendant's guilt that was more than sufficient to convict him of the charged misconduct without relying upon the propensity/bad-character implications of defendant's reference to his having committed a prior arson. Moreover, having earlier withdrawn his objection to the unqualified admission of this prior-arson statement and having failed to object on Rule 404(b) grounds to the admission of this evidence via Cifredo's bail-hearing testimony, defendant was already somewhat compromised by his tactical decision to allow this evidence to come in without any objection on his part and to allow the court's earlier instruction on this evidence to stand without objection. Thus, when defendant tried to reassert his objection in response to the prosecutor's later and improper attempt to maximize the inculpatory significance of this evidence against defendant during his closing argument, the jury already had this evidence before it, was aware that defendant had withdrawn his previous objection to its admission, and had been instructed on what use it could and could not make of it.

Second, the prosecutor's acting in conformity with closing argument was not so prejudicial as to deprive defendant of a fair trial—especially in light of the trial justice's previous jury instruction on this point and defendant's withdrawn objection to the evidence in question. As a result, we are convinced that the court's error in failing to instruct the jury to disregard this argument does not require a new trial because, absent the prosecutor's improper argument, it is clear to us beyond a reasonable doubt that the jury would have

returned a guilty verdict anyway. *See United States v. Hasting*, 461 U.S. 499, 511–12, 103 S.Ct. 1974, 1982, 76 L.Ed.2d 96, 108 (1983) (applying harmless error analysis to prosecutor's improper closing argument). *See also In re Shannon B*, 725 A.2d 893, 895 (R.I.1998) (holding that admission of hearsay constituted harmless error when there was "more than sufficient other evidence in the record to support" the verdict); *State v. McKone*, 673 A.2d 1068, 1075 (R.I.1996) (finding that harmless error occurred when the challenged testimony "was in fact otherwise supported by other direct or indirect evidence in the record").

In sum, defendant's prior-arson statement was admissible to prove defendant's motive to commit the charged misconduct, to establish his knowledge of how to accomplish the type of crime in question, and to show his settled purpose, malicious plan, and criminal intent to do the very act that he was charged with: namely, the commission of arson in retaliation for what had happened to William. ("No one returns with good will to the place which has done him a mischief.") [12] Accordingly, even if defendant's lawyer had not withdrawn his objection, the trial justice did not err in admitting this evidence. And even though the trial justice should have sustained defendant's objection to the prosecutor's acting in conformity with closing argument and instructed the jury to disregard this contention, such errors were harmless in light of the trial justice's previous instruction to the jury concerning the proper and improper uses of this evidence, the earlier withdrawal of defendant's objection to the admission of this evidence through Southerland's testimony, his non-objection to its admission through Cifredo's testimony, and the other overwhelming evidence of defendant's guilt.[13]

12. Phaedrus, *Fable* No. 18, 1.

13. The dissent earnestly suggests to us that "either Rule 404(b) should be honored or it should be repealed." Our corresponding suggestion to the dissent—most respectfully advanced—is that either the text of Rule 404(b) should be honored *in its entirety*, including all of the specified and unspecified purposes for which prior-bad-acts evidence can be admitted into evidence, or those who disagree with that text should advocate elsewhere for the

### D. Defendant's Remaining Arguments

■■■■ We also conclude that defendant's remaining arguments are meritless. The evidence of defendant's flight was admissible without regard to the validity of the arrest warrant that defendant challenges. The defendant's flight from Rhode Island and his later attempt to flee from his mother-in-law's apartment preceded any arrest or entry to effect the arrest and, therefore, the evidence of defendant's flight did not flow from the execution of the arrest warrant. In any event, we conclude that the arrest warrant here was valid. The original warrant unequivocally used the name "Jose Perez," one of the names to which defendant answered. As a result, the fact that someone later added the name "Jose Garcia" to the warrant—allegedly without authorization to do so—did not invalidate the warrant itself. Rather, it was valid before and notwithstanding this addition and/or alteration. Further, the flight evidence here was clearly admissible under the standards this Court has used in allowing such evidence to be introduced at trial. The evidence was capable of supporting each of four related inferences: (1) That defendant's behavior constituted flight, (2) that it indicated a general consciousness of guilt, (3) that the consciousness of guilt was attributable to the specific crime alleged, and (4) that consciousness of guilt concerning the crime charged implied actual guilt of the crime charged. *See State v. Reyes*, 705 A.2d 1375, 1377 (R.I.1998) (citing *State v. Cooke*, 479 A.2d 727, 732–33 (R.I.1984)).

■■■■ We also determine that the trial justice was correct in denying defendant's motion to preclude the state from impeaching his credibility with two misdemeanor convictions for offenses committed when he was seventeen years old. The trial justice concluded that the defendant's two prior convictions in the state of New York for criminal possession of stolen property in the fifth degree and criminal possession of a controlled substance in the seventh degree were not mere juvenile adjudications under New York law. Absent any showing that the trial court abused its discretion in giving full faith and credit to New York's "adult" classification of these prior adjudications, we have no basis to reverse this discretionary ruling. *See State v. Morel*, 676 A.2d 1347, 1357 (R.I. 1996). These convictions occurred less than a year before the fire. Moreover, even defendant's lawyer conceded that they "do have some reflection on a person's trustworthiness."

■■■■ Finally, we hold that the trial justice did not err in imposing sentences of life without parole upon defendant for having participated in the murder of two of the youngest children among his six victims. Pursuant to G.L.1956 § 11–23–1, "[e]very murder * * * committed in the perpetration of * * * any arson * * * is murder in the first degree." Furthermore,

> "Every person guilty of murder in the first degree * * * committed in a manner creating a great risk of death to more than one person by means of a weapon or device or substance which would normally be hazardous to the life of more than one person * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 * * * shall not be eligible for parole from imprisonment." Section 11–23–2(2).

■■■■ In *State v. Villani*, we said that a "felony murder is murder in the first degree simply because the Legislature has said so. A first-degree-murder conviction, be it a willful, malicious, premeditated killing or a felony murder, calls for the mandatory imposition of at least a life sentence." 491 A.2d 976, 980 (R.I.1985). Chapter 23 of title 11 does not limit this holding. Here, defendant poured gasoline

---

repeal or modification of this rule. But until and unless the rule is changed, all of it should

be honored and enforced, not just the exclusory portion that the dissent seeks to champion.

down three flights of stairs in a building where he was told that children might be living. Moreover, given his knowledge of the potential presence of children in the house, defendant was very likely aware that their parents or other care-giving adults might be living there as well. His actions in thereafter pouring and igniting the gasoline in the dead of the night, when the children and most of the residents of a three-story house probably would be asleep, represented conduct "committed in a manner creating a great risk of death to more than one person." *See* § 11–23–2(2). Moreover, no evidence of any mitigating factors emerged at trial. The defendant barely knew William, the victim of the car-dragging, yet he urged and sought revenge for the victim's injury without showing any concern whatsoever for the fact that innocent people might be hurt by his inflammatory rampage. Most significantly, when informed later that his incendiary behavior did indeed cause children to be burned to death, the defendant responded simply that "he didn't give a f* * * ." The Supreme Court has held that a state may impose its harshest penalty upon a "cold-blooded, pitiless slayer" who kills without feeling or sympathy. *Arave v. Creech,* 507 U.S. 463, 470, 113 S.Ct. 1534, 1540, 123 L.Ed.2d 188, 197 (1993). The defendant's actions reveal such a pitiless disposition and justify the harsh sentences he received.

## III

### Conclusion

For these reasons, we deny the defendant's appeal and affirm the convictions and sentences.

WEISBERGER, Chief Justice, concurring and dissenting.

I concur with the majority opinion on all issues save issue No. III, in which the defendant asserts error on the part of the trial justice for having admitted evidence of his commission of a prior uncharged act of arson and permitted improper argument as to its use. I believe that the admission and prosecutorial argument relating thereto was in direct violation of Rule 404(b) of the Rhode Island Rules of Evidence adopted by this Court. We stated in *State v. Gallagher,* 654 A.2d 1206, 1210 (R.I. 1995):

"As a general rule, evidence that shows or tends to indicate that the accused has participated in a crime for which he or she is not on trial, even if it is the same type of crime, is irrelevant and inadmissible. *State v. Cardoza,* 465 A.2d 200, 202 (R.I.1983); *State v. Jalette,* 119 R.I. 614, 624, 382 A.2d 526, 531 (1978); *State v. Mastracchio,* 112 R.I. 487, 493, 312 A.2d 190, 194 (1973). 'The overriding policy of excluding such evidence * * * is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.' *State v. Colvin,* 425 A.2d 508, 511 (R.I.1981) (quoting *Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 218–19, 93 L.Ed. 168, 174 (1948)). When a jury is allowed to consider independent crimes for which a defendant is not on trial, a real possibility exists that such indication of bad character or bad acts would create prejudice in the minds of the jurors and improperly influence their decision in regard to the crimes charged. *Colvin,* 425 A.2d at 511. The danger is that jurors may believe that the prior crimes or bad acts denote a propensity in a defendant to commit the crime with which he or she is charged. In these circumstances the potential for prejudice outweighs the probative value of such evidence, and it is therefore inadmissible. *State v. Brown,* 626 A.2d 228, 233 (R.I.1993); *State v. Chartier,* 619 A.2d 1119, 1122 (R.I.1993)."

In the case at bar, two witnesses stated that defendant had relayed to them a prior exploit in which he had burned down a "crackhead's" house in New York because the owner had "stiffed him" for an indebtedness of $600. The New York crime had

nothing to do with the criminal act with which defendant was charged in the case at bar. Counsel for defendant had filed a motion in limine to exclude this evidence. The trial justice denied this motion and deferred his ruling until the testimony would be offered at trial. At that time the trial justice overruled the objection and admitted the testimony. Counsel for defendant objected and indicated that this was a violation of Rule 404(b), which specifically forbids the introduction of evidence of prior bad acts "to prove the character of a person in order to show that the person acted in conformity therewith."

In the case at bar, counsel for the state during closing arguments referred to the testimony relating to defendant's having committed arson in the State of New York in the following manner: "Why did he become involved [in the arson at issue]? Because it was * * * an excuse to do what he was best at, burning houses in revenge, just like he had done in New York. [He] burned a crackhead's house when [he] got stiffed for $600. * * * *What he was doing was acting in conformity about what he had done.*" Counsel for defendant objected to this statement. The trial justice overruled the objection and declined to give a cautionary instruction at that point. Counsel for defendant also moved to "pass the case." This motion was denied by the trial justice.

It is hard to imagine a more flagrant example of a prosecutor's urging a group of lay jurors to consider a prior criminal act for the sole purpose of seeking to persuade them that defendant acted in conformity with a propensity evidenced by a prior act.

More than twenty years ago Justice Kelleher writing for this Court in *State v. Jalette*, 119 R.I. 614, 624, 382 A.2d 526, 531–32 (1978), gave a general admonition setting forth the inadmissibility and irrelevance of evidence which tended to indicate that the accused has committed another crime completely independent of that for which he is on trial, even though it be a

crime of the same type. For this proposition he cited *State v. Mastracchio*, 112 R.I. 487, 312 A.2d 190 (1973); *People v. Kelley*, 66 Cal.2d 232, 57 Cal.Rptr. 363, 424 P.2d 947 (1967); *Ross v. State*, 276 Md. 664, 350 A.2d 680 (1976); *State v. Cote*, 108 N.H. 290, 235 A.2d 111 (1967); and *Whitty v. State*, 34 Wis.2d 278, 149 N.W.2d 557 (1967).

He went on to give the rationale for the proposition.

"This principle is merely an expression of the rule which bars the state from the initial introduction of evidence of the accused's bad character. *See State v. Guaraneri*, 59 R.I. 173, 194 A. 589 (1937). Thus, the state may not present evidence of other criminal activity by the accused unless the evidence is 'substantially relevant for some other purpose than to show a probability that he has committed the crime on trial because he is a man of criminal character.' McCormick, *Evidence* § 190 at 447 (2d ed.1972). Moreover, another reason for this exclusionary principle is the prejudicial potential of such evidence, the real possibility that the generality of the jury's verdict may mask a finding of guilt which is based upon involvement with unrelated crimes rather than on the evidence which shows the defendant guilty of the crime charged. *Spencer v. Texas*, 385 U.S. 554, 560, 87 S.Ct. 648, 652, 17 L.Ed.2d 606, 612 (1967)." *Jalette*, 119 R.I. at 624, 382 A.2d at 532.

Justice Kelleher did not end with that general admonition but went on to instruct trial justices and hopefully this Court concerning the manner in which such evidence, even if admissible, should be managed in the trial court, including the method of instruction to be given to the jury.

"We are extremely conscious that the indiscriminate use of 'other crimes' evidence poses a substantial risk to an accused's right to a fair trial. We adopt the holding in *Kelley* with the admoni-

tion that this type of evidence should be sparingly used by the prosecution and only when reasonably necessary. *Whitty v. State, supra.* The trial court should exclude such evidence if it believes it is purely cumulative and not essential to the prosecution's case. Evidence of other crimes is admissible only when it tends to show one of the exceptions to which we have previously alluded and only when that exception is relevant to proving the charge lodged against the defendant. *State v. Curry,* 43 Ohio St.2d 66, 330 N.E.2d 720 (1975). In seeking to attain this particular goal, the trial court may insist that the prosecutor point to the specific exception on which he relies and show how that exception relates to the pending charge. In its charge the trial court should not take a scatter-shot approach and list all of the exceptions to the exclusionary rule. Rather, it shall designate with particularity the specific exceptions to which the 'other crimes' evidence is relevant and delete from its charge the remaining exceptions." *Id.* at 627–28, 382 A.2d at 533.

In the instant case, the trial justice did not follow this admonition. He did not give a cautionary instruction at the time the evidence was introduced. He did not delineate when the instruction was given the specific exception on which the state relied. Nor did he show how that exception related to the pending charge.

It is not difficult to understand why counsel for the state did not indicate the specific exception, since in his closing argument the prosecutor suggested to the jury that the sole purpose of this evidence was to show propensity (that he acted "in conformity about what he had done"). I earnestly suggest that this evidence and particularly the argument of counsel for the prosecution did not fit any of the exceptions listed in Rule 404(b). These exceptions are "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable." *Id.* An examination of these exceptions with a minimum of analysis would show with transparent clarity that none of them applied to the burning of the "crackhouse" in New York. The sole motivation and purpose of this evidence was to prove propensity. If the rule means anything, it is designed to bar propensity evidence. Unlike the situations involved in some of our prior cases, this evidence was not introduced to prove an element material to the chain of proof of the crime at issue. *See, e.g., State v. Acquisto,* 463 A.2d 122, 128 (R.I.1983); *State v. Cline,* 122 R.I. 297, 330, 405 A.2d 1192, 1210 (1979).

The trial justice did prior to final argument at the request of counsel for Garcia give the following instruction:

"Now there's been some evidence of a statement by one of the defendants about an alleged crime. Let me read you what the rules say. 'Evidence of a—evidence of other crimes, wrongs or acts are not admissible to prove the character of the person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, acts [*sic*] of mistake or accident.'

So, it's not used to show the defendant committed this particular crime. He's presumed innocent. All—both defendants are presumed innocent and evidence of any other unlawful activity is not used to show that someone has the capacity to commit a crime."

If any instruction could be construed as "scatter-shot" as described by Justice Kelleher, the foregoing instruction would meet such a description.

The majority raises two arguments in support of the trial justice's ruling. First, they suggest that the crackhouse burning revealed both Garcia's "vengeful motive and his 'settled purpose' to commit the charged misconduct, as well as his pre-

ferred plan and intention to achieve his revenge via arson * * *."

This statement like the trial justice's charge is a mere collocation of words. The burning of the crackhouse in New York had nothing to do with the motive for burning the house in Providence. The majority gives lip service to the obligation of the trial justice to explain the limited purpose for which the jury may consider such evidence, but apparently are unable to select an appropriate purpose even at the appellate level. They cite a series of cases which are wholly inapplicable to the case at bar. The New York incident did not reveal a plan or motive or design. Nor did it prove an element of the crime charged. *See Acquisto*, 463 A.2d at 128. Its sole purpose was to show propensity, a purpose which is forbidden.

The majority further relies upon the fact that counsel for Garcia withdrew his objection to evidence concerning the New York incident after that objection had been overruled.

Nevertheless, counsel for Garcia asked for a cautionary instruction in regard to the Rule 404(b) evidence. In response to that request, the trial justice gave the scatter-shot instruction quoted above. Certainly the issue of the adequacy of this instruction has been preserved.

There is certainly no question that counsel for Garcia objected clearly and emphatically to the final argument of counsel for the prosecution and asked for an immediate instruction indicating that this argument was improper. The trial justice overruled the objection, thus blessing the argument of the prosecutor with judicial approval, and declined to give an instruction at that point. This issue has been preserved and is admitted by the majority to have constituted error. However, the majority considers that error to be harmless in light of the instruction given by the

trial justice. I must vehemently disagree with that conclusion.

The prosecutor's argument set at naught anything that the trial justice may have indicated in his scatter-shot instruction earlier in the case. The evidence was wrongfully admitted in the first instance. The motion in limine was wrongfully denied in the first instance. The withdrawal of objection at one point in the trial did not dilute or vitiate the reassertion of that objection at later points in the trial and particularly at the time of final argument. The trial justice's response to those objections was wholly inadequate and ineffective.

The majority's determination that these errors were harmless emphasizes again the admonition of Justice Kelleher in *Jalette* that such evidence should be used only when reasonably necessary. If this error was harmless, the evidence could not have been reasonably necessary to the prosecution's case.[14]

It is time that this Court should rein in the prosecutorial tendency to utilize evidence of prior bad acts even when totally irrelevant to the crime charged. *See State v. Hopkins*, 698 A.2d 183, 189–91 (R.I. 1997) (Weisberger, C.J., dissenting). Unless we are willing to abandon the field in this area and erase Rule 404(b) from the Rhode Island Rules of Evidence, it is incumbent upon us to enforce it particularly in such an egregious case as that presented before us now.

As Judge Posner suggested in *United States v. Wright*, 901 F.2d 68, 70 (7th Cir.1990), the admitting of evidence of other crimes of the same general character as that with which the defendant is charged without fitting it into an appropriate exception would erase Rule 404(b). In that case, similar to the situation in the case at bar, the trial judge admitted a statement

---

**14.** We suggested in *State v. Acquisto*, 463 A.2d 122, 129 (R.I.1983), that the reasonable necessity requirement of *Jalette* would not be mandatory in a case not involving a sexual offense when the evidence was relevant to prove an element of the crime charged. There is no such relevance here.

made by the defendant which was recorded by the police. On the tape the defendant admitted committing other drug crimes and bragged about being a drug dealer. The trial judge admitted the evidence purportedly pursuant to Rule 404(b) of the Federal Rules of Evidence as exceptions for the purpose of establishing identity and intent. Judge Posner writing for the Seventh Circuit Court of Appeals asserted unequivocally that the statement did not prove identity or intent but rather established only the forbidden element of propensity.

Since, in the case at bar, the trial justice declined to give an instruction immediately following the prosecutor's admittedly wrongful and inappropriate statement of the use to which the evidence of the burning of the crackhouse should be put and failed to address this matter in his final instructions to the jury, the lay jurors were permitted to embark upon their deliberations with the erroneous words of the prosecutor ringing in their collective ears. If this is not an invitation to erroneous application of a prior uncharged crime, it would be difficult to conceive of a situation wherein the invitation would be more emphatic.

My suggestion to the majority most respectfully advanced is that either Rule 404(b) should be honored or it should be repealed. The crime with which this defendant was charged and of which he was convicted is of the most heinous sort. The brutality with which innocent persons were burned to death is almost beyond description. Such a crime is appropriately punished by the most severe sentence that the law of the State of Rhode Island would allow, life imprisonment without parole. However, it is in just such a case that this Court must demand of the prosecution and the trial justice that evidence used to convict the defendant be properly admissible and probative of the crime charged. It is in such cases that our resolve to accord due process and appropriate standards of proof is most severely tested.

I, therefore, would respectfully dissent from the majority opinion on this issue and would award the defendant a new trial in which this evidence would be unequivocally and categorically excluded.