STATE

v.

Roger P. GREENE.

No. 2002–163–C.A.

Supreme Court of Rhode Island.

June 2, 2003.

Marcy E. Coleman, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present WILLIAMS, C.J., FLANDERS, GOLDBERG, JJ., and WEISBERGER, C.J. (Ret.).

## OPINION

WEISBERGER, Chief Justice (Ret.).

This case comes before us on an appeal by the defendant Roger P. Greene (Greene or defendant) from a judgment of conviction entered in the Superior Court for the County of Washington. The defendant was charged by indictment with three counts of first-degree child molestation sexual assault and two counts of second-degree child molestation sexual assault on Mary Stephens,[1] who was then under fourteen years of age.

The defendant was tried before a justice and jury in the Superior Court for the County of Washington on September 25, 26, and 27, 2001. After the trial, the jury returned verdicts of guilty on all counts of the indictment. The trial justice denied defendant's motion for a new trial and, on November 30, 2001, he sentenced defendant to imprisonment for thirty years (twenty to serve, and ten suspended, with probation of ten years) on each of the first three counts of the indictment and to imprisonment for fifteen years (five years to serve and ten years suspended, with probation for ten years) on counts 4 and 5 of the indictment. All sentences were ordered to be served concurrently. The defendant appealed on December 10, 2001. We deny and dismiss defendant's appeal. The facts and procedural history of this

1. This is not the real name of the victim in this case, but a pseudonym that has been used to protect the victim's privacy.

case insofar as pertinent to this appeal are as follows.

### Facts and Procedural History

The father of the victim testified that defendant had been a close friend for more than twenty years. During this period, defendant was a frequent visitor at the father's home and provided services as a handyman and as a baby sitter. The father often allowed his ten-year-old daughter, Mary, to spend nights at defendant's home. It was during these visits that defendant allegedly molested Mary. Mary testified that she had known defendant during her entire life and that she considered him almost as a second father. She testified that each Tuesday she saw defendant because Tuesday was her father's day off from work. The father and defendant were close friends. She further testified that she spent time alone with defendant and stayed overnight in his home. The home consisted of a small Quonset hut. She enjoyed being with defendant and asked her parents to bring her to visit with him. She testified that she recalled having spent the night at defendant's home on about five separate occasions. She said that she slept in the same room with defendant. This room was described as a "bedroom/living room." During the first two overnight visits, nothing unusual happened.

On a subsequent day when she came for an overnight visit, she and defendant began by taking a nature walk in the woods. However, they went to the home of a friend of the defendant. The defendant had been watching this home while the friend was on vacation. Mary recalled that there were animal figures in the living room of the friend's home, including some deer heads. While they visited the home, defendant secured a pornographic videotape from the bedroom, took it back to his own dwelling, and watched the tape with Mary. While they watched the videotape, defendant began touching Mary in a sexual manner. He touched her breasts with his hands and mouth. He then inserted a finger inside her vagina and later inserted his tongue into her vagina. Mary further testified that during this activity, defendant was naked and began to rub his penis.

She described another, previous incident when she was staying overnight in defendant's home. During this incident, defendant placed a finger in Mary's vagina until she told him to stop. Mary testified that she returned to defendant's home after that incident because she believed that he would not act this way again because she had told him that it hurt her. When Mary returned home; she did not inform her parents about what had occurred because defendant had told her that her parents would be angry at both her and defendant if she had told them of these incidents. Two or three years later Mary disclosed the events to her cousin, and then finally told her mother. In January 2000, Mary's father informed Detective Christopher Emerson (Det.Emerson) of the North Kingstown Police Department of these incidents. On January 17, 2000, Det. Emerson began an investigation of defendant. He arranged for an interview of Mary by a forensic investigator employed by the Child Advocacy Center. He scheduled an interview with defendant. The defendant voluntarily went to the police department to participate in this interview.

At the beginning of the interview, Det. Emerson read to defendant his *Miranda* rights and explained to him that he was being investigated concerning a charge of first-degree child molestation on Mary Stephens. The defendant signed a form that set forth the *Miranda* rights. Detective Emerson also signed the form as a witness, and it was admitted at trial without

objection. The defendant waived his *Miranda* rights, both orally and in writing, and agreed to speak with representatives of the police department, but refused to give a written statement in the matter.

During the course of the statement, defendant admitted that he was very friendly with Mary's father and that he spent a great deal of time with Mary. He admitted that he allowed Mary to sleep over at his house. He also recounted that he watched the home of a friend, which was a short distance from his own home. However, he denied that he had taken Mary to the friend's home. The defendant also admitted to the police officer that he slept naked in the same bed with Mary when Mary slept over at his home. The defendant admitted to Det. Emerson that he owned pornographic materials, but said that he did not have any pornographic videos when Mary stayed at his home. The defendant denied having had any sexual contact with Mary, but did say that he and Mary communicated about sex through telepathic means. He said that Mary communicated to him through mental telepathy that she wanted to perform an oral sex act upon him. He also said that, when Mary was only seven years old, she crawled between his legs and tried to pull down his zipper in an attempt to perform an oral sex act upon him. The defendant also said that he used mental telepathy to teach Mary about sex by advocating that she be guided by "good morals" and "good common sense."

A witness, Donald Barbour (Barbour), who resided at 126 Middle Street, North Kingstown, during the time of the alleged sexual activity between defendant and Mary, testified that he had given a key to his home to defendant in 1992 and that defendant had access to his home during this relevant period. Mr. Barbour also testified that he had animal fixtures, including white-tailed deer, in his living room and in other parts of his home. Mr. Barbour also testified that he owned approximately a half-dozen pornographic videotapes that he kept in the back row of a deep bookcase.

Gregory Hartnett (Hartnett) was a child protective investigator employed by the Department of Children, Youth and Families. He served in this capacity for twelve years. Hartnett became involved in the investigation on January 18, 2000, when a representative of his department received a phone call indicating that Mary Stephens may have been the victim of sexual abuse. On that same day, Hartnett went to the Stephens's home in the company of members of the North Kingstown Police Department. An interview of Mary by a forensic interviewer from the Child Advocacy Center was arranged. Hartnett attended the interview. He also conducted an interview of defendant on February 16, 2000, at the North Kingstown Police Department. The defendant related to Hartnett that he had known Mary since she was a baby and that he had a very close relationship with her. He described this relationship as being so close that he could communicate with her telepathically. The defendant also said that Mary communicated telepathically that she wanted to have oral sex with him. The defendant also stated that he talked to Mary about sex. He told her that "sex was for love." He also stated that Mary had spent the night in his home on a number of occasions when she was ten or eleven years old. He described the relationship in the following terms: "It was like being with a grown-up woman."

Another member of the North Kingstown Police Department, Lieutenant Charles Brennan (Lt. Brennan), participated in the interview of defendant. In response to Lt. Brennan's questions, defen-

dant said that he had slept naked in the same bed with Mary on at least six occasions. The defendant said that he was sexually attracted to Mary and that she looked at him seductively. The defendant also told Lt. Brennan that he had observed Mary rub herself on a number of occasions, and that she told him that she "leaked vaginal juices" when she did this. The defendant also told Lt. Brennan that he communicated telepathically with Mary and that he could tell by looking at her that she wanted to perform oral sex upon him. The defendant said to Lt. Brennan that he was not aroused by Mary and that, although he had been with beautiful women and watched pornographic videotapes in the past, he was not aroused by either the beautiful women or the pornographic videotapes.

Although there was equipment available at the North Kingstown Police Department to audiotape and videotape interviews, no audiotape or videotape recording of the interview with defendant was made. Also, the interview conducted by Hartnett—the child protective investigator—was not recorded.

In support of his appeal, defendant raises a single issue. Further facts will be supplied as needed to deal with this issue.

### The Admitting of Testimony Concerning Defendant's Viewing of Pornographic Videotapes in the Past

Before the commencement of the trial, defendant filed a motion *in limine* in which he sought to preclude the state from eliciting testimony from the North Kingstown police concerning his admitting at an interview that he watched pornographic videotapes in the past. Counsel for the defense argued that this evidence was not relevant, and that it was extremely prejudicial. Counsel for the prosecution argued that the victim would testify that she and defendant watched a pornographic videotape immediately before one incident in which improper touching took place. The prosecution suggested that this testimony was relevant to corroborate the victim's testimony. The trial justice denied the motion *in limine* and found that the disputed testimony was relevant. He further found that the relevance of the testimony outweighed any potential prejudice. The trial justice concluded that if this testimony was subject to exclusion, pursuant to Rule 404(b) of the Rhode Island Rules of Evidence, it would be eligible for admission by reason of one of the exceptions to the rule and would be relevant to show defendant's "lustful disposition." Rule 404(b) reads as follows:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

During the course of the trial, evidence concerning the viewing of pornographic tapes by defendant came into evidence through the testimony of Lt. Brennan. His testimony on this subject was as follows:

> "Q During the course of the interview did the subject matter of pornographic materials come up?
>
> "A Yes, it did.
>
> "Q Was that a question you asked him?
>
> "A I asked him about arousal, and he indicated to me that he had been with beautiful women before and that he had watched pornographic films before, and he did not become aroused.

"Q  Do you recall exactly what question that was that elicited that response?

"A  I asked him if he had become aroused by [Mary Stephens] and he indicated he did not.

"Q  And continued on with the fact that he had been with beautiful women and watched pornographic material?

"A That's correct."

The trial justice held the foregoing testimony to be admissible when challenged by the motion *in limine*, finding that it was relevant and would corroborate the testimony of the victim that she went to the Barbour house with defendant to retrieve a pornographic tape.  He determined that under the balancing test required by Rule 403 of the Rhode Island Rules of Evidence the relevance clearly outweighed any potential prejudice.[2]  This Court has held on numerous occasions that the determination of relevance is left to the sound discretion of the trial justice.  This includes the determination of weighing probative value against the probability of undue prejudice. *State v. Garcia*, 743 A.2d 1038, 1050 (R.I. 2000); *State v. Gordon*, 508 A.2d 1339, 1347 (R.I.1986).  We also have held that the trial justice's ruling on the issue of relevance will not be disturbed on appeal unless there is a showing of an abuse of that discretion which is prejudicial to defendant. *Garcia*, 743 A.2d at 1050; *Gordon*, 508 A.2d at 1347.

We are of the opinion that in this case, in light of the totality of evidence, the testimony of Lt. Brennan on this issue was not significantly prejudicial.  The questions asked of defendant were designed to determine whether he was sexually aroused by the victim and/or by pornographic materials.  In both instances he answered in the negative.  Essentially, his brief colloquy with Lt. Brennan on this subject tended to be exculpatory.  It did not tend to establish that defendant was of lustful disposition.  Indeed, this statement, if believed, would have had just the opposite effect.  This testimony, unlike the testimony of previous uncharged sexual acts, as in *State v. Jalette*, 119 R.I. 614, 623–24, 382 A.2d 526, 531 (1978), did not tend to show defendant had "a lustful disposition" toward the victim or toward anyone else.  Even if this colloquy between defendant and Lt. Brennan might be considered to be of marginal relevance, its prejudicial effect, in our opinion, was so slight as to be virtually imperceptible.  In short, we believe that this testimony was harmless beyond a reasonable doubt in the total context of the evidence in this case.

We are also of the opinion that it was of so little prejudicial effect that no limiting instruction was necessary, nor would it have been of assistance to defendant.  Calling additional attention to this relatively antiseptic exchange might have enhanced its importance in the minds of the jurors.

We therefore conclude that the trial justice did not commit reversible error in admitting the testimony of Lt. Brennan on this subject.  We also conclude that the trial justice did not commit reversible error in failing *sua sponte* to give a limiting instruction concerning this testimony.  It is notable that the defendant did not request such an instruction.  In all likelihood, trial counsel made an appropriate tactical decision in declining to make such a request.  This was not a situation as presented in *State v. Toole*, 640 A.2d 965, 971 (R.I.1994), in which we held that a trial justice should offer a limiting instruction,

2.  The defendant did not renew his objection at trial.  Nor did he move to strike.  Nevertheless, we shall assume that this issue was preserved by the motion *in limine* to exclude this portion of Lt. Brennan's testimony.

even though not requested to do so, after having admitted evidence of other sexual acts.

## Conclusion

For the reasons stated, the appeal of the defendant is denied and dismissed. The judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

Justice FLAHERTY did not participate.